LEAR SIEGLER INC., doing business
as Safelite Glass, Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

No. 87–2409.

United States Court of Appeals,
Tenth Circuit.

Dec. 11, 1989.

William G. Haynes, Eidson, Lewis, Porter & Haynes, Topeka, Kan., for petitioner.

John D. Burgoyne, Asst. Gen. Counsel (Rosemary M. Collyer, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, and Aileen A. Armstrong, Deputy Associate Gen. Counsel, with him on the brief), N.L.R.B., Washington, D.C., for respondent.

Before MOORE, ANDERSON and EBEL, Circuit Judges.

STEPHEN H. ANDERSON, Circuit Judge.

Lear Siegler, Inc. ("Lear") petitions for review of a decision of the National Labor Relations Board (the "Board"), essentially adopting findings of an Administrative Law Judge that Lear violated Sections 8(a)(1) and 8(a)(5) of the Labor Management Relations Act. 29 U.S.C. § 158(a). The Board seeks enforcement of its order.

The issues arise from certain events surrounding wage negotiations pursuant to reopener provisions in two separate collective bargaining agreements.[1] The Board found that Lear violated the Act by unilaterally modifying the terms of employment under those two agreements. It also found violations by Lear's threats to replace employees if they participated in an unfair labor practices strike, by its refusal to provide information to the unions, and by its threats aimed at an employee regarding his union activities. *Lear Siegler, Inc.*, 283 N.L.R.B. 136 (1987). We grant enforcement of the Board's order as to all of its findings with one exception. For reasons explained below, we conclude that the record does not sufficiently support the Board's finding that Lear improperly insisted to impasse on modifications which were beyond the scope of the reopener clause in one of the two contracts involved. Therefore, as concerns that one contract reopener, Lear was entitled to take some of the actions to which the Board objects.

## BACKGROUND

Lear sells and installs automobile glass in nine shops located in the San Francisco, California area. It employs 17 installers who are represented by Local Union Nos. 169, 1621, and 718 of the Glaziers, Architectural Metal & Glass Workers Union, International Brotherhood of Painters & Allied Trades, AFL–CIO. In 1982, Lear negotiated a contract with Local 718 covering two of its locations and another contract with Locals 169 and 1621 covering its remaining seven locations. Both contracts covered three years from July 1, 1982 to June 30, 1985, and both contained reopener provisions for further negotiations relating to employee compensation during the final two years of the contract term.

In June 1983, Lear negotiated a wage increase with its unions under each of the contract reopeners for "one year only," beginning July 1, 1983. Both Lear and the unions agreed to meet again the following year to discuss the reopeners for the final contract year. Accordingly, in June 1984, the parties to these contracts met to negotiate jointly the reopeners under both contracts for the upcoming year.

These joint negotiations involved several meetings which took place during June and July of 1984. Proposals were made by both parties to the contract, but no agreement could be reached. Ultimately, the parties were at impasse. The exact cause of this impasse is a question which we will address more fully below. Nevertheless, upon reaching this impasse, Lear unilaterally modified several terms of its employees' compensation benefits according to one of its early proposals which the unions had rejected.

Based on these changes, and other changes affecting vacation and holiday eligibility, the ALJ concluded, and the Board agreed, that Lear had unilaterally decreased its employees' hourly wage rate and abrogated the health and welfare, pen-

---

**1.** Reopener clauses are contractual agreements to renegotiate certain items at a later date. "Reopener clauses in collective bargaining agreements allow both parties an opportunity to modify their existing agreement in order to meet changing economic conditions. As such, they serve to minimize economic uncertainty at the time of bargaining." *NLRB v. Pratt & Whitney Air Craft Div., United Tech. Corp.*, 789 F.2d 121, 125 (2d Cir.1986).

sion, and holiday and vacation provisions of the existing contracts in violation of Sections 8(a)(1) and 8(a)(5) of the National Labor Relations Act. Because the two contracts contain significantly different reopener provisions, we address each of the contracts, and the issues pertaining to each one of them, separately.

Our standard of review in cases arising under the National Labor Relations Act is mandated by statute. "The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive." 29 U.S.C. § 160(e). Even where the reviewing court might have reached a different conclusion were it to consider the case de novo, the Board's decision may not be set aside unless there does not appear to be sufficient evidence in the record supporting the Board's factual determination. *See NLRB v. Automotive Controls Corp.*, 406 F.2d 221, 226 (10th Cir.1969).

Substantial evidence, however, is more than a mere scintilla of proof. "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938); *see NLRB v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300, 59 S.Ct. 501, 505, 83 L.Ed. 660 (1939); *NLRB v. Pratt & Whitney Air Craft Div., United Tech. Corp.*, 789 F.2d at 126 ("Congress has directed the courts to 'assume more responsibility for the reasonableness and fairness of Labor Board decisions....'") (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 490, 71 S.Ct. 456, 466, 95 L.Ed. 456 (1951)).

## I.

### CONTRACT REOPENER NEGOTIATIONS

It is undisputed that a contract reopener provision permits midterm modification of a contract. *See NLRB v. Lion Oil Co.*, 352 U.S. 282, 286, 77 S.Ct. 330, 332–33, 1 L.Ed.2d 331 (1957). Nevertheless, an employer cannot insist on modifications beyond the scope of the terms addressed by the specific reopener provision. An impasse caused by the employer's insistence on negotiating over terms outside the reopener does not justify unilaterally modifying the contract terms. *See, e.g., NLRB v. Pratt & Whitney Air Craft Div., United Tech. Corp.*, 789 F.2d 136; *cf. Federal Labor Relations Auth. v. Office of Personnel Management*, 778 F.2d 844, 848 (D.C.Cir. 1985) (Under Title VII of the Civil Service Reform Act of 1978, "the FLRA recently has held that unions may not negotiate over new subjects *during the term of an agreement* absent a specific contract reopener." (emphasis in original)) (citing *Internal Revenue Service*, 19 F.L.R.A. 401 (1985)). Absent a reopener clause specifically authorizing a modification, unilateral changes in the terms of employment during the course of an agreement constitute an unfair labor practice. *Allied Chemical & Alkali Workers of Am., Local Union No. 1 v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 159, 92 S.Ct. 383, 387, 30 L.Ed.2d 341 (1971) ("[A]n employer's mid-term unilateral modification of [a mandatory subject of bargaining contained in a contract] constitutes an unfair labor practice...."). Such changes are only permissible where both parties negotiate in good faith but reach an impasse over some item within the scope of the midterm reopener. *See NLRB v. United Nuclear Corp.*, 381 F.2d 972, 976 (10th Cir.1967) (where parties "negotiate the proposed change to the point of impasse, ... the employer may lawfully take the proposed action") (citing *NLRB v. Crompton–Highland Mills Inc.*, 337 U.S. 217, 69 S.Ct. 960, 93 L.Ed. 1320 (1949)).

### A. The Contract With Locals 169 and 1621.

The contract with Locals 169 and 1621 specified a total compensation package, set at an initial level of $19.34, which includes a basic hourly wage rate and contributions to the union health and welfare fund, industry trust fund, and pension fund. The contract states that the "total package" would be increased by $.50 per hour effective October 1982. A reopener provision then provides that "[E]ffective May 1, 1983 it is agreed that the Union and [the Company] shall meet to determine the

wage *increase* for the remaining two (2) years of this Agreement." R. Vol. II, Exhibit 2, at p. 12 (emphasis added).

Notwithstanding the agreed limitation to an increase in wages it is undisputed that in 1984 Lear insisted on negotiating a *decrease* in the total compensation package.[2] The unions refused to discuss anything but an "increase" in·the package as delineated in the reopener. Ultimately, as noted above, the parties reached an impasse in negotiating the reopener in 1984.

Lear acknowledges that, upon reaching impasse in the reopener negotiations, it unilaterally decreased its employees' wages, thus implementing changes in the terms of employment during the term of an existing collective bargaining agreement. It now contends that the reference to a wage increase in the reopener provision permitted *any* modification to the compensation package, whether in the form of an increase or a decrease. The Board's findings do not explicitly address the point. However, implicit in the Board's determination that Lear violated the Act is the Board's finding that any discussion of a decrease in the compensation package was outside the scope of the reopener. This conclusion is amply supported by the unambiguous language of the reopener itself. Furthermore, as demonstrated by the reopener provision in the second contract before us, discussed below, Lear knew very well how to provide for an open-ended wage reopener.

Lear was not entitled to insist to impasse on a decrease in the total wage package as a prerequisite to negotiating the midterm *increase* encompassed by the reopener. The record amply supports the conclusion

that it did so, and thereafter unilaterally decreased wages. Thus, the Board correctly concluded that Lear's unilateral modification of its contract with Locals 169 and 1621 by decreasing the employees' wage package in 1984 was unlawful.

### B. *The Contract with Local 718.*

█ The wage schedule in Lear's contract with Local 718 contained the language "wages to be negotiated" beside each of the contract years 1983 and 1984. There is no dispute that such contract reopener language permitted negotiations over either wage decreases or increases. The problem stems from Lear's inclusion of proposed changes in holiday and vacation benefits as a subject for negotiation during the 1984 reopener, along with attempts to negotiate wage decreases. Specifically, Lear proposed to (a) shift holidays so that Washington's Birthday, one of the seven paid holidays listed in the contract, would be replaced by the employment anniversary date, (b) implement new eligibility requirements for holiday pay which would require that each employee work the day before and the day after a holiday in order to be paid for it, and (c) make changes in the amount of and eligibility for vacation pay.[3]

As previously indicated, negotiations broke down. Thereafter, Lear unilaterally implemented both the wage decreases and changes in vacation and holiday benefits. The Board determined that these unilateral changes were unlawful on the ground that provisions relating to holidays and vacations were "noneconomic" subjects outside the reopener clause relating to wages; and, that Lear caused an impasse which was not a bona fide·impasse because it partially

---

**2.** As part of its unilateral modifications to the employees' compensation package, Lear discontinued its contributions to the Union Health and Welfare, and Pension Funds. Lear also altered the wage rate and vacation/holiday pay so that the entire compensation package after these changes was $16.95 as opposed to the initial contract level of $19.30, computed before the negotiated wage increases which came into effect in June 1982 and 1983.

**3.** The contracts provide that each employee who works 40 weeks per year is entitled to three weeks paid vacation. Under the proposed

scheme, employees would be entitled to two weeks paid vacation after one year of employment and three weeks after ten years. To be eligible, an employee must work 1800 hours during the 12 months prior to the employee's anniversary date. The proposal also entailed discontinuing Lear's contribution to the union's holiday and vacation fund, and the union pension plan, medical plan, and industry fund. Instead, the vacation and holiday costs would be paid directly to employees; the pension and medical plans would be replaced by Lear's own plans.

resulted from the proposed improper modifications.[4]

Although Lear suggests that the economic consequences of its proposed changes in vacation and holiday eligibility requirements fairly include those subjects within the term "wages" as used in the contract reopener, we agree with the Board that such is not the case.

However, even assuming Lear attempted to bargain on an improper subject, that in itself is not unlawful. An employer can legitimately make a proposal outside the terms of a reopener clause provided it does not insist to impasse upon inclusion of that proposal in the contract. *See NLRB v. Wooster Div. of Borg–Warner Corp.*, 356 U.S. 342, 349, 78 S.Ct. 718, 722–23, 2 L.Ed.2d 823 (1958); *NLRB v. Pratt & Whitney Air Craft Div., United Tech. Corp.*, 789 F.2d at 136.

The crucial question is whether the impasse between Lear and Local 718 resulted at least partially because of Lear's proposed changes in holiday and vacation benefits. It is on this point which we disagree with the Board, and find that the Board's decision adverse to Lear is not supported by the record. The facts are as follows.

In June 1984, the parties met to negotiate wages for the final contract year pursuant to the reopener clause. At a meeting on June 13, 1984, representatives for all the unions involved proposed a wage increase which Lear rejected. Lear then requested that the unions consider negotiating changes to the vacation and holiday provisions of the contracts. The unions refused to discuss anything other than "wages," and insisted that Lear tender its proposal on the reopener provisions.

The June 13 meeting adjourned, and the parties agreed to meet again later that month. On June 26, 1984, the parties met

a second time. Lear asked for the union response to its June 13 proposal. The unions refused to discuss the earlier proposal, apparently objecting to any negotiations relating to noneconomic items such as the eligibility requirements for holiday and vacation pay. The union representative stated: "we're here to talk money only...." R. Vol. III at Tab 3, p. 10.

After a brief caucus, Lear presented an alternative proposal which included a decrease in the total wage package from $20.34 to $16.95,[5] and a reduction in the total paid vacation from three weeks per year to two weeks per year for employees of less than ten years. The unions thereafter presented a counterproposal, a basic 5% increase in the total wage package.

Lear then offered that if the unions would accept its total wage package of $16.95, it would agree to discuss with the unions the distribution of the package. The unions rejected this latest proposal, indicating that such a significant decrease was unacceptable. The meeting ended with both parties expressing willingness to hear further proposals from the other side, but with a clear understanding that unless agreement could be reached, the current contract provisions would expire July 1, 1984.

On July 5, 1984, after an exchange of telegrams between the parties, Lear dispatched a representative to meet with the unions in order to "accept any written counter proposal which [the unions] intended to make available." R. Vol. III, at Tab 3, p. 12. The unions informed Lear's representative that they had no further proposal, but that they wished to review Lear's financial records to verify its claims that the San Francisco area operations were experiencing financial difficulties. The unions indicated that their membership might accept a freeze or a reduction if Lear was

---

**4.** The Board found that the impasse resulted, at least partially, from Lear's proposals relating to eligibility requirements and other items in the contracts' holiday and vacation provisions:

"[E]ven if [Lear] genuinely believed that it could modify the agreement after reaching a bona fide impasse, no such impasse was possible because [Lear] additionally insisted on changing noneconomic terms of the holiday and vacation provisions.... [T]he noneco-

nomic items were so integral to the remaining economic proposals as to make one contingent on the acceptance of the other." *Lear Siegler, Inc.*, 283 N.L.R.B. at 137 n. 3.

**5.** In June 1984, the total compensation package was $20.34. The $19.34 package for the first contract year had been increased by two negotiated raises of $.50 each, effective July 1, 1982 and 1983.

truly experiencing financial losses. The financial statements were delivered to the unions sometime before July 8, 1984; the statements showed a pre-tax loss of $385,837.

The final meeting between the parties occurred on July 16, 1984. The unions acknowledged receipt of the financial statements, and the existence of operating losses, but indicated that their auditors required some supporting information to identify the exact character of the losses. The unions nevertheless advanced a proposal consisting of a $.75 per hour increase in the total wage package, contrasted with the unions last previous proposal of $1.02 increase. Lear informed the unions that it was financially unable to discuss any wage increase; that unless the unions were willing to negotiate a decrease in the total wage package then the parties had nothing further to negotiate. The unions replied that they were unwilling to negotiate a decrease in the wage package. A final proposal by Lear of $16.50 per hour total package was rejected because, as the unions noted, it was less than the $16.95 which Lear had previously proposed. Lear indicated that it could wait no longer due to the pressing financial situation, and informed the unions that effective the next pay period, it would institute the lower wage rate and Lear's own insurance package previously offered to the unions.

In assessing the relative importance of Lear's proposals during the lengthy negotiations, the Board ignored the evidence directly relating to the actual cause of the impasse itself. Although Lear never explicitly withdrew its first proposal, with its noneconomic changes to vacation and holiday benefits, neither the unions nor Lear did *anything* to imply that those relatively minor terms were the cause of the impasse which eventually occurred more than a month after Lear made that proposal.

The impasse between the parties became evident at the final meeting on July 16, 1984. The relevant facts surrounding that meeting are undisputed. The meeting commenced with the unions advancing a proposal consisting of a $.75 per hour increase in the total wage package. Lear informed the unions that it was financially unable to discuss any wage increase; that unless the unions were willing to negotiate a decrease in the total wage package then the parties were at impasse. The unions replied that they were unwilling to negotiate a decrease in the wage package. Thus, the issue was clearly framed—the noneconomic proposals had become inconsequential to the major thrust of the discussion. Indeed, according to the findings of the ALJ, no mention was made of these noneconomic items during the final meeting. *See* R. Vol. III, at Tab 3, p. 13–14. These facts are inconsistent with a conclusion that the impasse was in any way due to the noneconomic modifications included in Lear's first proposal. The facts show conclusively that the subject of the impasse was Lear's insistence on a net decrease in the total wage package, and the unions' insistence on a net increase.[6]

In arriving at its conclusion that Lear's noneconomic provisions were inextricably bound to the economic portions of its proposals, the Board placed significant reliance on the fact that Lear proposed noneconomic modifications, that those proposals were never expressly revoked, and that the changes eventually enacted unilaterally by Lear incorporate some of these noneconomic modifications. The Board's reliance on these facts as evidence that Lear insisted on those noneconomic provisions to impasse is misplaced. The critical determination is what *caused* the impasse; not what resulted from the impasse. Simply because Lear proposed the noneconomic changes early in the negotiations, and later

---

6. We further reject the Board's conclusion that Lear had effectively linked any negotiations under the reopener to its initial request to discuss noneconomic items. As the ALJ's description of the final meeting demonstrates, the eligibility requirements of the vacation and holiday provisions under the contracts were no longer a matter of serious consideration between the parties at the time the impasse was reached. Furthermore, nothing in the record indicates that Lear refused to negotiate a wage package which did not incorporate the noneconomic provisions of Lear's first proposal. The Board itself found that the company "did not expressly condition acceptance of its June 13 offer on a change in actual holidays...." *Lear Siegler, Inc.,* 283 N.L.R.B. at 137.

revived its first proposal at a time *after* impasse had been reached does not imply that those relatively minor provisions formed the essence of the impasse. The testimony elicited from both parties indicates that the impasse resulted from one single issue: a wage increase versus a wage decrease. When considered in light of the evidence directly related to the circumstances surrounding the impasse itself, the inference that the impasse involved anything more than this single issue is not supported by the evidence.

We conclude, therefore, that the impasse which the Board found to have occurred between the parties was entirely due to Lear's insistence on negotiating a decrease in the total wage package.

Upon reaching impasse over the proposed wage decrease, Lear informed its employees that it would unilaterally change its terms of employment by discontinuing its contributions to union plans, by decreasing the hourly wage rate, and by making various changes to employees' holiday and vacation privileges. These changes effectively incorporated Lear's earlier proposal of $16.95 total compensation package and changes in noneconomic vacation and holiday terms.

Having bargained in good faith to impasse with the unions over its proposed wage decrease, Lear was entitled unilaterally to adopt the proposed provision over which the impasse arose. *See Newspaper Printing Corp. v. NLRB*, 625 F.2d 956, 966 (10th Cir.1980). Nevertheless, it could not unilaterally modify those terms of the contract with Local 718 which were outside the scope of the reopener clause. *NLRB v. Northeast Okla. City Mfg. Co.*, 631 F.2d 669, 675 (10th Cir.1980). Lear therefore violated the Act by unilaterally altering the noneconomic provisions relating to holiday and vacation benefits. We accordingly grant enforcement of the Board's order insofar as it relates to these impermissible changes to contract terms outside the scope of the reopener clause; however, we

deny enforcement of that portion of the Board's order relating to Lear's modifications to the wage package under this contract.

## II.

## LEAR'S WARNINGS TO POTENTIAL STRIKERS

■ Lear challenges the Board's finding that Lear violated section 8(a)(1) of the Act by threatening its employees with permanent replacement should they go out on strike. The Board based its conclusion on two factual determinations: that statements made by Lear management were coercive threats rather than mere statements of law; and that the threats were made to discourage Lear employees from participating in an anticipated lawful strike which the employees contemplated, at least in part, to protest portions of Lear's proposals which clearly fell outside the scope of the reopener. Lear contests these factual determinations. Under the appropriate standard of review, we conclude that the Board's factual determinations are supported by substantial evidence in the record considered as a whole.

The Act makes it "an unfair labor practice for an employer ... to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed" by the Act. 29 U.S.C. § 158(a)(1). Those guaranteed rights include the right to "engage in ... concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157. In testimony before the ALJ, two employees, each covered by one of the two contracts with Lear, indicated that in response to employees' questions concerning an anticipated strike, Lear representatives had clearly told them they would be permanently replaced if they participated in a strike. These statements were made at a meeting during which Lear informed its employees that the unions were unwilling to accept its first proposal, and that the company did not intend to give in to union demands.[7]

---

7. The ALJ found that during the meetings between Lear and its employees, Lear's Vice President of Industrial Relations:

"explained the 13 June offer to the employees and compared the benefits which the employees were receiving under the terms of the current contracts with those they would re-

Under these circumstances, the Board correctly found the statements to be nothing but threats of reprisals against workers who backed a union strike in the event of an impasse in negotiations.

The Board also concluded that the "strike" referred to by Lear's employees would have been caused in part by their concerns over noneconomic terms contained in Lear's first proposal. This is also substantially supported by the record. Lear described its initial proposal, which contained numerous items clearly beyond the scope of either reopener clause, to all of its employees; this immediately prompted the questions concerning the strike. These noneconomic modifications would severely limit some employees' eligibility for vacation and holiday privileges. To assume that the employees cared nothing about such a potentially deleterious result would be illogical absent some evidence to the contrary. No evidence appears in the record to contradict the Board's factual determination in this regard. The employees did not indicate that they were concerned only about the economic provisions of the proposal.

At the time of Lear's threatening remarks, no bargaining impasse had been reached on any issue, and the ultimate issue which was to become the subject of the impasse had not yet become apparent. The employees were given no reason to believe that Lear would alter its proposal. Under these circumstances, sufficient evidence exists to support the Board's determination that the employees were considering a strike in the event that Lear refused to move off this initial bargaining position. The employees clearly had the right to consider such a strike, and could have lawfully participated in it had Lear refused to alter its proposal. That Lear eventually *did* move off its position, and that no strike ever occurred is irrelevant. "The test for a violation of section 8(a)(1) 'is not whether an attempt at coercion has succeeded or failed but whether "the employer engaged in conduct which reasonably tends to interfere with, restrain or coerce employees in the free exercise of their rights under Section 7." ' " *Medallion Kitchens, Inc. v. NLRB*, 806 F.2d 185, 191 (8th Cir.1986) (quoting *NLRB v. Intertherm, Inc.*, 596 F.2d 267, 271 (8th Cir.1979) (quoting in turn *Russell Stover Candies, Inc. v. NLRB*, 551 F.2d 204, 208 (8th Cir.1977))); *NLRB v. Albion Corp.*, 593 F:2d 936, 939 (10th Cir. 1979).

On June 27, 1984, before it enacted any of the unilateral modifications to the employee's wages or benefits, Lear distributed a bulletin to its employees stating that "An [e]mployer has the right to permanently replace *[e]conomic* strikers to continue its business operation in the event of a strike." R. Vol. III, Tab 3 at 27 (emphasis added). Lear now contends that this legally correct statement, sent before any impasse had been reached, and devoid of any specific information relating to the situation in each of its own shops, sterilizes the verbal communications between Lear representatives and its employees regarding permanent replacement of anyone who participated in a strike. This contention is wholly without merit. *See Furr's, Inc. v. NLRB*, 381 F.2d 562, 567 (10th Cir.), *cert. denied*, 389 U.S. 840, 88 S.Ct. 70, 19 L.Ed.2d 105 (1967); *NLRB v. Dover Corp., Norris Div.*, 535 F.2d 1205, 1210–11 (10th Cir.), *cert. denied*, 429 U.S. 978, 97 S.Ct. 488, 50 L.Ed.2d 586 (1976). The record clearly supports the Board's findings. Under our limited scope of review, we conclude that the Board's determination is factually and legally correct.

### III.

### LEAR'S REFUSAL TO PROVIDE EMPLOYEE INFORMATION

The Board also found that Lear violated the Act by refusing to furnish the unions with the names, addresses, and other relevant information concerning its em-

---

ceive under [its] proposal.... He told the employees that because of [Lear's] severe financial losses incurred due to high labor costs that [Lear] in order to remain in business would have to cut its labor costs and that in order to do this [Lear] had made its 13 June

offer to the Unions and that the Unions had the option of accepting [the] 13 June offer or rejecting it and showing their displeasure by striking."
Decision of A.L.J., R.Vol. III, at Tab 3, p. 29.

ployees. *See Safeway Stores, Inc. v. NLRB*, 691 F.2d 953, 956 (10th Cir.1982) (employer must disclose information relevant to unions' duties). Lear acknowledges its refusal to disclose the information to the unions. Lear contends, however, that it was justified in refusing the request because of the settled rule that an employer may refuse to disclose relevant information if there is a "likelihood of a clear and present danger to the employees involved." *United Aircraft Corp. v. NLRB*, 434 F.2d 1198, 1207 (2d Cir.1970), *cert. denied*, 401 U.S. 993, 91 S.Ct. 1232, 28 L.Ed.2d 531 (1971); *Sign and Pictorial Union Local 1175 v. NLRB*, 419 F.2d 726, 738 (D.C.Cir.1969) (employer justified in refusing information where non-striking employees had been "harassed, threatened and assaulted" by strikers and union ignored requests for assurances that information would not be used to further such harassment).

Here, the ALJ and the Board concluded that no likelihood of danger or union abuse existed. The record supports this conclusion. No testimony was offered that any employee had been threatened, harassed, or otherwise intimidated by the unions. Lear offered no testimony demonstrating union misconduct. The only evidence introduced in support of Lear's assertion that the information would be misused is an informal settlement agreement between Lear and the unions to dispose of an unfair labor practice charge relating to alleged misconduct in discriminating against non-union employees which Lear had previously brought against the unions. Even in this document, the unions expressly stated that they did not admit any violations on their part. Applying the "substantial evidence" standard to the Board's conclusion, we cannot set aside its finding.

## IV.

### INTERROGATING EMPLOYEES CONCERNING UNION ACTIVITIES

■ Finally, Lear contends that the Board erroneously concluded Lear violated the Act by contacting an employee and threatening to discharge that employee after he informed the union of a grievance with Lear's management. Lear contends that this "isolated incident" does not warrant a finding of any violation.

In June 1984, one of Lear's employees filed a complaint with the union concerning an unexplained delay in receiving a pay increase due him under the collective bargaining agreement. When the union informed Lear that it intended to file a grievance on behalf of the employee, Lear personnel contacted the employee, demanding: "What's this union stuff? . . . This is not a threat, this is a promise. I'll be watching you, and you make one mistake and you're gone." R. Vol. III, at Tab 3, p. 43. This court has stated: "[I]nterrogating employees concerning their union activities . . . is prohibited . . . if accompanied by coercion, threat, or restraint." *Presbyterian/St. Luke's Medical Center v. NLRB*, 723 F.2d 1468, 1475 (10th Cir.1983). Clearly, threatening to discharge an employee as a result of a grievance filed by the union on that employee's behalf constitutes such a prohibited activity. We accordingly affirm the Board's conclusion that the statements of Lear personnel to the employee in question violated the Act.

## CONCLUSION

For the reasons stated above, we grant the Board's petition for enforcement of its order in all respects with the exception that Lear is permitted unilaterally to decrease the wage rates and other economic benefits within the total compensation package for employees covered by the contract between itself and Local 718 in accordance with its proposal which specified a total package of $16.95, effective as of the date of the impasse between the parties to that contract.

IT IS SO ORDERED.