**CHICAGO TRIBUNE COMPANY, Petitioner, Cross–Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent, Cross–Petitioner.**

Nos. 91–2750, 91–2916.

United States Court of Appeals, Seventh Circuit.

Argued April 1, 1992.

Decided May 29, 1992.

Rehearing Denied June 24, 1992.

Elizabeth Kinney, N.L.R.B., Region 13, Chicago, Ill., Aileen A. Armstrong, Linda J. Dreeben, David Seid (argued), N.L.R.B., Appellate Court, Enforcement Litigation, John C. Truesdale, N.L.R.B., Contempt Litigation Branch, Washington, D.C. and Paul Bosanac, N.L.R.B., Region 30, Milwaukee, Wis., for N.L.R.B.

R. Eddie Wayland (argued), E. Andrew Norwood, King & Ballow, Nashville, Tenn. and William O. Howe, Chicago Tribune Co. Employee Relations, Chicago, Ill., for Chicago Tribune Co.

James B. Coppess, Washington, D.C. and Richard Rosenblatt (argued), Englewood, Colo., for Chicago Mailers Union No. 2.

Before BAUER, Chief Judge, POSNER, Circuit Judge, and NOLAND, Senior District Judge.*

POSNER, Circuit Judge.

Before us are cross-petitions to review and to enforce an order by the National Labor Relations Board finding that the publisher of the *Chicago Tribune* committed several unfair labor practices in a dispute with the union that represents the employees in its mail room. The dispute arose from a strike that began in July 1985 after negotiations for a new collective bargaining agreement broke down. The strike was marred by violence directed against the replacement workers whom the company hired to operate the mail room while the regular employees were out on strike. Tires were slashed, death threats made, windows shot out, a supervisor's garage firebombed. While all this was going on, the union asked the company to give it the names of the replacement workers, ostensibly so that it could verify that the company had indeed hired these people, which would determine how many of the striking workers would be entitled to reinstatement when the strike ended. (The union had in fact made an unconditional offer to return to work, which the company had rebuffed on the ground that all the jobs were filled by replacement workers.) The company refused the union's request for names, on the ground that the replacement workers might be harassed further, as once their names were known their addresses and phone numbers could easily be obtained from the telephone book. It offered the union two alternatives: providing the names of the replacements to an accounting firm that would verify their employment, and providing the union with the birthdate of each worker and a part of his or her social security number. The union rejected both alternatives without explanation and unsuccessfully renewed its demand for the names. The administrative law judge, seconded by the Board, pronounced the alternatives that the company had offered "reasonable" but held nonetheless that the union was entitled to the names. The union had a presumptive right to them which the company could defeat only by showing that there was a "clear and present danger" that the union would use the names for purposes of harassment. In finding that the company had not carried its burden of showing such a danger, the administrative law judge noted that in August 1987, eleven months after the company had turned down the union's demand for the names, the company had done an about face and given the union the names and addresses of the replacement workers even though the strike and the violence were continuing.

▮ The Board has taken the position in a number of cases that a union has a statutory right to the names of replacement workers unless the company can prove a "clear and present danger" of harassment. That position, although described in *Lear Siegler Inc. v. NLRB*, 890 F.2d 1573, 1581 (10th Cir.1989), as a "settled rule" and recited with apparent approval in numerous court of appeals decisions, including our own *NLRB v. Illinois–American Water Co.*, 933 F.2d 1368, 1377 (7th Cir.1991), should not be taken literally. No *statute* entitles a union to the names of replacement workers. The demand for names is in the nature of a discovery request. *Id.* at 1378; cf. *NLRB v. Acme*

* Hon. James E. Noland of the Southern District of Indiana, sitting by designation.

*Industrial Co.*, 385 U.S. 432, 437–38, 87 S.Ct. 565, 568–69, 17 L.Ed.2d 495 (1967). The parties have a dispute, and one of them wants information germane to its resolution. In deciding whether the duty to bargain in good faith (29 U.S.C. § 158(a)(5)) requires the other party to disclose the information in the form demanded, the judge must have due regard for the interests of third parties, including workers, even replacement workers. The pattern of violence that marked the strike was bound to arouse concern in their minds about their personal safety should their names be disclosed. It is not as if the union had stood virtuously aloof from the violence: after a riot outside one of the company's facilities the union was enjoined from engaging in violent picketing. The company, moreover, was offering the union alternatives to the names that, so far as anyone has been able to show, were completely adequate. The union's unexplained refusal to accept either alternative suggests that it wanted the names not necessarily to harass the replacement workers directly but perhaps to do so indirectly by giving them an additional source of anxiety.

Where the Board got the idea that a union's demand for the names of replacement workers is to be handled not like any other discovery request but by placing on the company an insuperable burden of proving that the union will in fact use the information to harass the workers beats us. We know where the "clear and present danger" formula comes from: Justice Holmes's great opinion in the early First Amendment case of *Schenck v. United States*, 249 U.S. 47, 39 S.Ct. 247, 63 L.Ed. 470 (1919). It debuted in the labor-information setting in *United Aircraft Corp. v. NLRB*, 434 F.2d 1198, 1207 (2d Cir.1970), where the Board's then test of "any present threat," *United Aircraft Corp.*, 181 N.L.R.B. 892, 903, enforced, 434 F.2d 1198 (2d Cir.1970), was first rhetorically inflated to "clear and present danger" and then mysteriously softened to "likelihood of a clear and present danger." The meaning and purpose of this reformulation elude us, and most of the later cases either drop "likelihood of" or treat it as surplusage.

E.g., *Shell Oil Co. v. NLRB*, 457 F.2d 615, 618–20 (9th Cir.1972); *Soule Glass & Glazing Co. v. NLRB*, 652 F.2d 1055, 1094–95 (1st Cir.1981).

A formula designed to protect rights of constitutional dignity has no proper application to a demand for a list of names in a garden-variety labor dispute. (Not for nothing did Holmes warn us that to rest upon a formula is a slumber that, prolonged, means death.) The union is not asserting a First Amendment right, and the company is not trying to stifle the union's right of free speech. With free speech nowhere in the picture, the decisive consideration is that, as the administrative law judge acknowledged, every *legitimate* need of the union for the list of names would have been met by either of the alternatives offered by the company. The cases recognize the relevance of alternatives. *NLRB v. Burkart Foam, Inc.*, 848 F.2d 825, 833–34 (7th Cir.1988); *E.W. Buschman v. NLRB*, 820 F.2d 206, 209 (6th Cir.1987); *Soule Glass & Glazing Co. v. NLRB, supra*, 652 F.2d at 1095; *Shell Oil Co. v. NLRB, supra*, 457 F.2d at 620. Indeed, *Buschman* holds that "an unfair labor practice charge is not made out where a company offers a facially reasonable accommodation in a situation involving the release of allegedly confidential information, and where no finding is made that the conditions offered were unreasonable or were only a pretext for a refusal to advance the bargaining process." In our case the danger is intimidation rather than breach of confidence—but surely that is no justification for a lesser degree of protection—and the accommodation offered by the company is not merely reasonable on its face but conceded to be reasonable in fact.

■ We must, however, consider the possibility that the company's about face almost a year after its initial refusal to release the names to the union is evidence of "pretext" within the meaning of *Buschman*. By August 1987, having concluded that the union no longer had the support of a majority of the workers, the company wanted to conduct a poll to demonstrate

this and it thought the union entitled to the names and addresses of all the workers to be polled so that it could verify the poll's accuracy. By then it was eleven months since the last demand for names and maybe the violence had abated or the company thought the problem would soon end because the union would be decertified. And, as we are about to see, the union accepted the company's offer for a new collective bargaining agreement in July 1987; that might have indicated that the dispute was winding down, and with it such collateral consequences as violence and harassment. All this is speculation but our point is only that the company's subsequent actions do not show that the union was reasonable in refusing to consider perfectly adequate alternatives that would have obviated the concern that the replacement workers were likely to feel at the knowledge that the union had their names.

Although *NLRB v. Burkart Foam, Inc.,* *supra,* involved no substantiated evidence of violence and no offer by the company of alternatives to turning over the names, the Board fastens on the following dictum: "Even if we were to find that Burkart did have a reasonable good faith fear of Union retaliation against its employees, Burkart would also have to show that the Union was asked for and refused to provide assurances that the employees would not be harassed." 848 F.2d at 834. Perhaps in the peaceful setting of that case *and* given the absence of alternatives to disclosure of the names, union "assurances" would be the most the company could reasonably demand. It would be naive to think that the replacement workers in this case would have found such assurance reassuring.

■ We therefore do not think that the company committed an unfair labor practice in refusing to turn over the list of names when the union requested it; nor in later refusing a request for the mail-room payroll, which the company reasonably interpreted as another way of asking for the same information—the replacement workers' names.

The other issue in the case arises out of the company's refusal to sign a collective bargaining agreement with the union despite the union's acceptance on July 27, 1987, of the company's offer. In June 1986, during the strike, the company had made an offer for a new collective bargaining agreement. Although the union's support among the workers had ebbed, the company on March 2, 1987, sent the union a letter in which it stated that it was making "no change in its firm proposal." So the offer of June 1986 was described as "firm" and (lest anyone thought it might have lapsed) was expressly renewed. It was not afterward modified or withdrawn and on July 27, 1987, the union wrote the company, unconditionally accepting the offer. The company nevertheless refused to sign the collective bargaining agreement, on the ground that the union no longer represented a majority of the workers. The poll to which we referred earlier was conducted the following month: the vote was 265 to 7 against the union's continuing as the representatives of the mail-room employees. The Board held that the union's acceptance of the company's offer had been valid and that the company's refusal to sign the collective bargaining agreement was therefore an unfair labor practice. The poll was still another unfair labor practice because, under the Board's cases, during the initial term (usually three years) of a collective bargaining contract the union is "irrebutably presumed" to enjoy the majority support of the workers. *Texas Petrochemicals Corp. v. NLRB*, 923 F.2d 398, 401 and n. 4 (5th Cir.1991); *Hajoca Corp. v. NLRB*, 872 F.2d 1169, 1173 (3d Cir.1989). This is the contract-bar rule.

■ In ordinary contract law, an offer that does not contain a deadline for acceptance—and neither the June 1986 offer nor its renewal in March of the following year contained a deadline—will nevertheless lapse after a reasonable time if not accepted. 1 E. Allan Farnsworth, *Contracts* § 3.19, at p. 254 (1990). In labor law, which seeks to promote collective bargaining, the offer binds the offeror until withdrawn, unless circumstances have so changed between the making of the offer and its purported acceptance that the offeree should have known that the offer had lapsed. *NLRB v. Burkart Foam, Inc., su-*

*pra,* 848 F.2d at 830; *Bickerstaff Clay Products Co. v. NLRB,* 871 F.2d 980, 993–94 (11th Cir.1989). The company concedes that nothing changed between March 2 and July 27, 1987. The loss of support for the union dramatically confirmed by the poll conducted in August had occurred before March 2. The company argues that its March 2 letter wasn't really a renewal of its offer; for while it did describe the previous offer both as final and unchanged, it added that the company had filed a petition for decertification. The implication, however, was simply that the union had better hurry up and accept the offer because otherwise it might find itself out in the cold completely.

The company complains bitterly and, as it seems to us, with some force about the Board's "blocking-charge rule": the Board refuses to consider a decertification petition, here first filed back in August of 1986, if there are unresolved unfair labor practice charges pending against the company, however unrelated they appear to be to the union's loss of support and however lacking in actual merit. *Briggs Plumbingware, Inc. v. NLRB,* 877 F.2d 1282, 1289–90 (6th Cir.1989); *NLRB v. Randle–Eastern Ambulance Service, Inc.,* 584 F.2d 720, 729 n. 10 (5th Cir.1978). Although the rule has been questioned, *NLRB v. Gebhardt–Vogel Tanning Co.,* 389 F.2d 71, 75 (7th Cir.1968); *Pacemaker Corp. v. NLRB,* 260 F.2d 880, 882 (7th Cir.1958); *Surratt v. NLRB,* 463 F.2d 378, 381 (5th Cir.1972); *Templeton v. Dixie Color Printing Co.,* 444 F.2d 1064, 1069 (5th Cir.1971); see also *NLRB v. Midtown Service Co.,* 425 F.2d 665, 672 (2d Cir.1970), the relevance of the company's complaint about it in this case eludes us. The company didn't have to renew its offer on March 2, 1987; it could instead have withdrawn it.

The company argues that the union's acceptance of the offer was invalid because it was motivated by a concern with the welfare not of the employees in the bargaining unit but of the employees of this employer's competitor, the publisher of the *Chicago Sun–Times,* who are also represented by this union. The union's contract with the Sun–Times Company includes a "most favored nations" clause, *Chicago Typographical Union # 16 v. Chicago Sun–Times, Inc.,* 935 F.2d 1501, 1503 (7th Cir. 1991), entitling (so far as relevant to this case) the Sun–Times Company to match any wage cut instituted by the Chicago Tribune Company. The Tribune argues that the collective bargaining agreement it offered the union was a bad deal for its mail-room employees but a good deal for the Sun–Times' employees because it put a floor under wage cuts by the Sun–Times; and since the union had lost the support of the workers in the Tribune's mail room, it might as well act to maximize the welfare of the workers in the Sun–Times's mail room, where the union retained greater support. That, the company argues, is why the union "sold out" the members of the bargaining unit at the Tribune by acceding to the company's offer.

This is a rather strange argument in the mouth of the Tribune. If the contract is such a bad deal for its workers, why isn't the Tribune delighted that the union signed it? If the company wanted to do better by its workers than its own offer contemplated doing, it should have withdrawn that offer rather than have renewed it. It cannot have it both ways—dangle the promise of a contract before the union, then withdraw the promise when the union bites. And the company is not its workers' good uncle.

But there is, to repeat an earlier point, a worker as well as a union interest in this case. The company's strongest argument is that, whether or not anything happened between the time it renewed its offer and the time the union attempted to accept it, and regardless of the company's own motives and tactics and whether it's playing cat and mouse and (if we may be forgiven for mixing metaphors) weeping crocodile tears, it had to be allowed to withdraw the offer because the law forbids a company to sign a collective bargaining contract with a union that it knows (*Fall River Dyeing & Finishing Corp. v. NLRB,* 482 U.S. 27, 51 n. 18, 107 S.Ct. 2225, 2240 n. 18, 96 L.Ed.2d 22 (1987)) does not have the support of a majority of the workers in the bargaining

unit. *International Ladies' Garment Workers' Union v. NLRB*, 366 U.S. 731, 81 S.Ct. 1603, 6 L.Ed.2d 762 (1961); *Randall Division v. NLRB*, 965 F.2d 141, 144–45 (7th Cir.1992); *Human Development Association v. NLRB*, 937 F.2d 657, 665 (D.C.Cir.1991); *NLRB v. Laverdiere's Enterprises*, 933 F.2d 1045, 1051–53 (1st Cir. 1991).

One might suppose that the company would be estopped to assert this rule when its own conduct in renewing the offer had invited the union's acceptance of the unlawful contract. But to allow estoppel in such a case would give scant protection to the interest of the workers in being allowed to decide whether to be represented by a particular (or by any) union. As a combined result of the blocking rule and the company's carelessness (or perhaps craftiness) in failing either to include a deadline in its offer or to withdraw it when it became clear that the union had lost the support of the workers, these workers will be living under a collective bargaining contract negotiated on their behalf (in a manner of speaking, since in fact the union merely accepted the employer's take-it-or-leave-it offer) by a union that they emphatically do not want to represent them. The contract-bar rule is not in play, because it presupposes a collective bargaining agreement that commanded majority support when signed, however things may have changed afterward; the rule kicks in "once an employer and a union enter into a *valid* collective-bargaining agreement." *El Torito–La Fiesta Restaurants, Inc. v. NLRB*, 929 F.2d 490, 492 (9th Cir.1991) (emphasis added).

As for the Board's rule that a union's unconditional acceptance of an offer for a collective bargaining contract is valid and binds the company unless circumstances have changed since the company's offer was made or renewed, we do not think the rule should apply to a case such as this where between the original offer and its renewal the union lost the support of the workers. That would give too much weight to the interests of unions and too little to the interests of workers. It would authorize a "sweetheart" deal between company and union at the expense of the workers. It would violate the *Garment Workers'* decision.

We therefore reject the beguiling syllogism: an offer not withdrawn can be accepted at any time provided there are no changed circumstances; an agreement once accepted must be signed; a signed agreement creates an irrebuttable presumption that the union has majority support. *NLRB v. Burkart Foam, Inc., supra*, 848 F.2d at 830; *H.J. Heinz Co. v. NLRB*, 311 U.S. 514, 523–26, 61 S.Ct. 320, 324–25, 85 L.Ed. 309 (1941); *Local 512, Warehouse & Office Workers' Union v. NLRB*, 795 F.2d 705, 712 (9th Cir.1986); *EPE, Inc. v. NLRB*, 845 F.2d 483, 491 (4th Cir.1988). The first premise must be qualified by the rule of the *Garment Workers'* case that forbids signing an agreement with a minority union known by the company to be such—we add this qualification to make clear that the company may not break off negotiations whenever signs of discontent with the union appear in the workers' ranks. Here the union had lost majority support long before it accepted the company's offer.

We acknowledge a tension with our dictum in *Continental Web Press, Inc. v. NLRB*, 742 F.2d 1087, 1095 (7th Cir.1984), that although "the probability that the union still has the support of a majority [of the workers] is small, ... if the delay were attributable in whole or significant part to the company, we would enforce the [bargaining] order nonetheless so as not to encourage delaying tactics." See also *NLRB v. Star Color Plate Service*, 843 F.2d 1507, 1510 (2d Cir.1988). Maybe, in suggesting that the workers be punished to punish the employer, we didn't give enough weight to the worker interest. The considerations, though, are somewhat different in a case in which the employer merely fails to withdraw an offer after discovering that the union has lost majority support than in a case in which the employer, having been subjected to a valid bargaining order, resists compliance with it until the workers lose heart and the union loses its majority.

There should be a sanction for such behavior, and maybe enforcing the bargaining order is the only feasible one. And likewise where, as in *Randall Division*, the employer agrees to bargain in exchange for the union's agreeing to drop an unfair labor practice charge and then immediately turns around and refuses to bargain on the ground that the union lacks majority support.

Those are true estoppel cases. This is not. We do not think the company committed an unfair labor practice in refusing to sign the collective bargaining agreement notwithstanding the union's acceptance. And, as we said earlier, it did not commit an unfair labor practice in refusing to turn over the names of the replacement workers to the union. These conclusions vitiate the grounds of the Board's order and moot the other issues that the company raises.

ENFORCEMENT DENIED.