**CHICAGO TRIBUNE COMPANY, Petitioner, Cross–Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent, Cross–Petitioner.**

Nos. 95–1942, 95–2221.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 30, 1995.

Decided March 19, 1996.

R. Eddie Wayland (argued), J. Thomas Warlick, IV, King & Ballow, Nashville, TN, for Petitioner in No. 95–1942.

Paul Hitterman, Julie B. Broido (argued), National Labor Relations Board, Contempt Litigation Branch, Elizabeth Kinney, National Labor Relations Board, Region 13, Aileen A. Armstrong, Peter D. Winkler, National Labor Relations Board, Appellate Court, Enforcement Litigation, Washington, DC, for Respondent on No. 95–1942.

Marion L. Griffin, Julie B. Broido (argued), National Labor Relations Board, Contempt Litigation Branch, Washington, DC, Elizabeth Kinney, National Labor Relations Board, Region 13, Chicago, IL, Aileen A. Armstrong, Peter D. Winkler, National Labor Relations Board, Appellate Court, Enforcement Litigation, Washington, DC, for Petitioner in No 95–2221.

R. Eddie Wayland (argued), J. Thomas Warlick, IV, King & Ballow, Nashville, TN, Bill Howe, Chicago Tribune Company, Chicago, IL, for Respondent in No. 95–2221.

Before BAUER, ROVNER, and EVANS, Circuit Judges.

BAUER, Circuit Judge.

In the last decade, relations between the Chicago Tribune Company ("Tribune") and the unions representing its employees have fallen somewhat short of labor peace. The acrimony has produced much litigation, and today's case concerns the Tribune's refusal to provide the home addresses of strike replacement employees to the Chicago Web Printing Pressmen's Union ("Pressmen"). After a six-month strike and several requests to the company, the Pressmen brought the matter before the National Labor Relations Board. Although the Board found that the Tribune had committed an unfair labor practice, we deny enforcement of the Board's order.

## I. Background

The events leading up to this appeal began at least as early as 1985, when the most recent collective bargaining agreement between the Pressmen and the Chicago Newspaper Publishers' Association, a collective bargaining association to which the Tribune belonged, expired. Negotiations for a new agreement faltered, and on July 18, 1985, the Pressmen's Union, the Chicago Typographical Union, the Chicago Mailers' Union, and the Chicago Paperhandlers' Union commenced a strike against the Tribune. In response to the strike, the Tribune began hiring permanent replacement workers.

Violence ensued shortly thereafter. Incidents ranged from the relatively benign, such as unsolicited orders for food deliveries or magazine subscriptions, to more dangerous activities such as the slashing of tires, death threats, and the stabbing of a Tribune delivery driver. On one occasion, mounted police were called to disperse a mob that had obstructed the path of the Tribune's delivery trucks. Stones thrown by the mob injured one of the truck drivers, a policeman, and other Tribune employees. Following that incident, the Tribune sought and received an injunction to prevent the unions from violent picketing. On January 30, 1986, the striking workers unconditionally offered to return to work. The Tribune created a preferential rehiring list for the returning strikers, and began reinstating them in May 1989.

During the strike and subsequent reinstatement, the affected unions made several requests to the Tribune for the terms of employment, names, and addresses of the replacement employees. The Tribune provided the terms of employment but, at the replacement employees' request, it withheld their names and addresses to protect their property and safety. The Tribune offered to provide the birthdates and social security numbers of the replacements, or to provide the names and addresses to an independent accounting firm that could verify their employment. The unions rejected the Tribune's offers of accommodation and instead filed unfair labor practice charges against the company. The Pressmen's original charge still is pending before the Board. The Board's Regional Director dismissed the Printers' charge. A third charge, brought by the Mailers' Union, already has reached this court. See *Chicago Tribune Co. v. NLRB*, 965 F.2d 244 (7th Cir.1992).[1]

While the initial charges were winding their way through the Board's administrative process and into the federal courts, the Pressmen continued to request the names and addresses of the replacement workers, purportedly so that it could pursue grievances on their behalf. In response, the Tribune offered a variety of alternatives to the Pressmen. These offers included personal communication by Pressmen representatives on company property during non-work times, posting of Pressmen notices on company bulletin boards, distribution of Pressmen information in non-work areas, and any other mutually agreeable alternative to the full disclosure proposed by the Pressmen. In sum, the Tribune responded to each Pressmen request for the information in the same manner—it cooperated with every request except to provide the names and addresses.

On February 4, 1993, the Pressmen again requested a list "of all employees with their current addresses." By this point, the Pressmen knew the names of the replacement employees, it merely wanted their home addresses. The Tribune's press department supervisors informed the replacement employees of the Pressmen request. When one supervisor reported back that the employees felt the same way they had before, the Tribune again denied the request.

This time, the Pressmen filed an unfair labor practice charge against the company. The Board's General Counsel issued a complaint alleging that the Tribune's refusal to provide the information violated its duty to bargain in good faith under §§ 8(a)(1) and 8(a)(5) of the National Labor Relations Act. 29 U.S.C. §§ 158(a)(1), 158(a)(5). An Administrative Law Judge found that the Tribune had violated the Act, and on March 31, 1995, the Board adopted the ALJ's findings. The matter is now before us on cross-petitions to review and enforce the Board's order.

1. To avoid confusion, we will refer to our 1992 decision as the "Mailers" case.

## II. Standard of Review

■ We have jurisdiction over the two petitions pursuant to 29 U.S.C. §§ 160(e) and (f). The Board's factual determinations are conclusive when supported by substantial evidence on the record as a whole. *Rock–Tenn Co. v. NLRB,* 69 F.3d 803, 807 (7th Cir.1995). The Board's legal conclusions are conclusive unless they are irrational or inconsistent with the Act. *NLRB v. Transport Service Co.,* 973 F.2d 562, 566 (7th Cir.1992).

## III. Analysis

■ This case concerns an employer's duty to bargain with a union in good faith, which includes a duty to provide relevant information needed by a labor union for the proper performance of its duties as the employees' bargaining representative. *Detroit Edison Co. v. NLRB,* 440 U.S. 301, 303, 99 S.Ct. 1123, 1125, 59 L.Ed.2d 333 (1979). The issue in Detroit Edison was whether an employer had a duty to disclose the scores that employees received on a battery of psychological aptitude tests without first obtaining waivers from the respective employees. The Supreme Court noted that a union's assertion that it needs information to process a grievance does not automatically oblige the employer to supply all of the information in the manner requested. The duty to supply information under § 8(a)(5) turns upon "the circumstances of the particular case." *Detroit Edison,* 440 U.S. at 314, 99 S.Ct. at 1131, *citing NLRB v. Truitt Mfg. Co.,* 351 U.S. 149, 153, 76 S.Ct. 753, 756, 100 L.Ed. 1027 (1956). We have analogized such requests to discovery demands in a lawsuit. *Graphic Communications Int., Local 508 v. NLRB,* 977 F.2d 1168, 1169 (7th Cir.1992).

■ With respect to the disclosure of information about replacement employees, the Board consistently has taken the view that the names and addresses of replacement workers are presumptively relevant information to which a union is entitled. See, e.g., *Trumbull Memorial Hospital,* 288 NLRB 1429, 1988 WL 214099 (1988); *Georgetown Holiday Inn,* 235 NLRB 485, 1978 WL 7556 (1978). Decisions in this and other circuits also have concluded that the names of replacement workers may be relevant to the collective bargaining process. *See, e.g., NLRB v. Illinois–American Water Co.,* 933 F.2d 1368, 1377 (7th Cir.1991); *Lear Siegler Inc. v. NLRB,* 890 F.2d 1573, 1580–81 (10th Cir.1989). However, the presumption of relevance is not irrebuttable. According to the Board, an employer may withhold relevant information if there is a "clear and present danger" that the union will misuse the information. *Page Litho, Inc.,* 311 NLRB 881, 1993 WL 191476 (1993), *enforcement granted in part and denied in part, Page Litho, Inc. v. NLRB,* 65 F.3d 169 (6th Cir.1995).[2]

■ In our *Mailers* decision, we traced the history of the "clear and present danger" formulation and criticized its application in the labor-information context. *See Chicago Tribune,* 965 F.2d at 247. We noted that a test designed "to protect rights of constitutional dignity has no proper application to a demand for a list of names in a garden-variety labor dispute." *Id.* Notwithstanding this admonition, the Board in this case relied on the "clear and present danger" analysis from its *Page Litho* decision. In announcing our decision today, we expressly reject the "clear and present danger" test as inconsistent with the totality of the circumstances approach set forth by the Supreme Court in *Detroit Edison,* 440 U.S. at 314, 99 S.Ct. at 1130–31.

■ More than five years have passed since the last demonstrated incident between the replacement employees and the returning strikers. The Board found that this amount of time was sufficient to entitle the Pressmen to the names and addresses of the replacement employees. However, the Board's decision failed to consider the nature and history of the violence between the groups of employees, the privacy concerns of the replacement workers, or the extensive list of alternative means of communication available to the Pressmen. Each of these factors weighs in favor of allowing the Tribune to withhold the replacement employees' home addresses.

2. In an unpublished decision, the Sixth Circuit denied enforcement of the portion of the Board's order that directed Page Litho to disclose the names of the replacement employees.

First, the pattern of violence that surrounded the strike undoubtedly raised concerns about the safety of the replacement employees. The Board argues that five years without incident is sufficient time for there to be no likelihood of danger that the Pressmen will misuse the information. In *Mailers,* we held that in the context of this dispute, it would be naive to think that replacement workers would find union guarantees of their safety reassuring. *See Chicago Tribune,* 965 F.2d at 248. Time ultimately may heal all wounds, but it would be equally naive to think that the replacement employees have forgotten the violence that has occurred. Replacement employees endured both verbal and physical assaults, and prior to the issuance of an injunction to prevent violent picketing, some employees suffered physical injury. A rule that focuses solely on the amount of time that has passed since a documented incident of violence fails to take into account the nature of the animosity that exists between former strikers and their replacements.

■ Second, the privacy concerns of the replacements also weigh in favor of denying enforcement of the Board's order. Relevant information may be withheld from a union where the interest in confidentiality outweighs the union's need for the information. *See East Tennessee Baptist Hospital v. NLRB,* 6 F.3d 1139, 1144 (6th Cir.1993). The record in this case demonstrates that the replacement employees themselves objected to the disclosure of their home addresses. In light of the threats of violence the replacements endured, these objections are hardly surprising. The need for the Tribune to provide home addresses, by contrast, is minimal. Replacement employees have worked side-by-side with union members for several years, and the Pressmen have had ample opportunities to communicate with the replacement employees. If the employees want to be contacted at home, they easily can provide their own addresses.

Finally, the third factor weighing in the Tribune's favor is the list of alternative methods of communication that it offered the Pressmen. In *Mailers,* we denied enforcement of the Board's order when the Tribune had offered to provide information about the replacement employees through an independent third party. *See Chicago Tribune,* 965 F.2d at 247. In this case, the Tribune has offered not only to provide third party mailing, but also to allow personal communication with replacement employees by union representatives during non-work times, the posting of union notices on company bulletin boards, and the distribution of union information and materials in non-work areas. Indeed, the Tribune has agreed to provide information in any mutually agreeable manner proposed by the Pressmen, but no proposal other than the disclosure of the addresses has been forthcoming.

The Board argues that the Pressmen's Union needs the names and addresses of the replacement employees so that it may contact them "as the need arises." To this end, the Board relies on our decision in *NLRB v. Burkart Foam, Inc.,* 848 F.2d 825 (7th Cir. 1988), but that case is readily distinguishable. In *Burkart Foam,* there were no documented incidents of violence, and the company neither proposed alternative methods of communication nor requested assurances that the union would not use the information for improper purposes.

Here, the ALJ readily acknowledged that the Pressmen wanted the replacements' names and addresses in order to proselytize. While such an objective is not illegitimate, it hardly rises to the level of "need." The Pressmen had several alternatives available to get the desired information. We do not think that the Tribune committed an unfair labor practice by refusing to disclose the replacement employees' home addresses.

## IV. Conclusion

For the foregoing reasons, the Tribune's petition for review is granted, and the Board's petition for enforcement is denied.

ENFORCEMENT DENIED.