**WILLIAMHOUSE–REGENCY OF DELAWARE, INC., Petitioner, Cross–Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent, Cross–Petitioner.**

No. 89–8917.

United States Court of Appeals, Eleventh Circuit.

Oct. 19, 1990.

---

James F. Smith, Steven S. Greene, Constangy, Brooks & Smith, Atlanta, Ga., for petitioner-cross-respondent.

Aileen A. Armstrong, N.L.R.B., R. Michael LaBelle, Powers & Lewis, Paul J. Spielberg, N.L.R.B., Washington, D.C., for respondent, cross-petitioner.

Before CLARK and COX, Circuit Judges, and TUTTLE, Senior Circuit Judge.

TUTTLE, Senior Circuit Judge:

This is a petition for review of an order of the National Labor Relations Board (NLRB) determining that Williamhouse–Regency of Delaware, Inc. violated Section 8(a)(5) and (1) of the National Labor Relations Act by refusing to execute a contract embodying the terms of the company's final offer.

## I. STATEMENT OF THE CASE

The Aluminum Brick and Glass Workers International Union, Local 198 (the Union) filed charges in June and September, 1988 against Williamhouse Regency (the Company), a manufacturer and distributor of paper products, alleging violation of the NLRA.[1] The matter was heard by an administrative law judge who found that the Company failed to execute a written contract after reaching an agreement with the Union and failed to remit employees' dues to the Union which it had withheld from employees' pay. The NLRB affirmed the ALJ's ruling on the ground that the Company presented a final offer to the Union on April 29 which remained open and available for acceptance until June 8, 1988; that on that date the Union's chief bargainer, Kenneth Logsdon, accepted the final offer and agreement was reached. The Company then filed this petition for review.

---

1. The Union filed charges: (1) On June 10, alleging failure to bargain in good faith; (2) on September 2, alleging the parties had reached agreement with respect to terms and conditions of employment but had refused to sign a contract; and (3) on September 12, alleging refusal to pay over to the Union dues withheld from employees' wages.

## II. FACTS

The Company manufactures paper products at Scottdale, Pennsylvania. The Union has represented the plaintiffs' production and maintenance employees, now numbering approximately 260, since the early 1960's. The current collective bargaining agreement ran from January 1, 1985 to April 30, 1988. The parties held several bargaining sessions between April 18 and 29, 1988. The chief bargainer for the Union was Kenneth Logsdon. He was assisted by a "wage committee" comprised of Local 198 President John Haney, Vice President Perry Whitaker, and Company employees, Mark Stasco, Bill Hunder, and Ed Bernstein. Under the Local Constitution, the wage committee was authorized to make a binding agreement with the Company. The Company's chief bargainer was Attorney Donald Ladov. He was assisted by Plant Manager McSwiney and Production Superintendent Coppula. At the outset of negotiations, the Union notified the Company that any tentative agreement would have to be ratified by the membership before it became a binding contract.

The Union's proposal sought an end of the two-tier wage structure and for substantial improvement in wages and fringe benefits (the economic terms). The Company responded by offering a proposal that had no wage provision. It reduced a number of existing fringe benefits and substantially modified the old contract's "purpose of agreement" and "grievance/arbitration procedure" sections.

At the parties' final meeting on April 29, the Company, represented by Board Chairman Martin Lewis, Company President Tim Mahan, and Company Vice President Ed Norton, in addition to its regular bargaining team, received from the Union a settlement proposal that called for a wage increase of 60 cents an hour in each of the following three years but dropped most of its demands for improved fringe benefits. In response, the Company submitted its own "final proposal." That offer included the "purpose of agreement" and "grievance/arbitration procedure" articles that

had been in the current contract. It contained an offer of a wage increase of 20 cents an hour for each of the three years of the contract. The Union's representatives expressed their dissatisfaction with the proposal but stated that they would submit it to the membership.

The Company then asked time for a caucus and a few hours later, presented an expanded written offer. At the top of the document, were the words "Williamhouse Final Offer Conditioned Upon Ratification." [2] Attorney Ladov told the Union that the words meant that if the employees failed to vote for it, the offer would be "gone." Also, Board Chairman Lewis made the same points and asked Logsdon, the Union's negotiator, to tell the employees that the offer would terminate if the employees rejected it. The union membership met on May 1 and voted to reject the offer and voted to strike.

The strike continued until May 26. During the strike, there were several instances of threats of violence on the picket line and the Company sought and obtained an order from the state court, which was consented to by the Union, that limited the Union to five pickets and enjoined them from coercive activities. During this strike, a number of Union employees crossed the picket line and returned to work and certain others telephoned the Company to say that they would like to return but they were prevented from doing so by the strike.

The next communication between the parties was a telephone call by Roy Albert, the Regional Director of the International's Region 4, to Ladov about May 10. He asked for a better wage offer from the Company and Ladov replied that the Board Chairman, Lewis, was greatly upset by the strike. The telephone call resulted in no new Company proposal. A few days later, Albert called Ladov again and told him that the strike could be settled if the Company came up with "just a few pennies." Ladov suggested that Albert call Lewis at a telephone number given him by Ladov. Albert called Lewis on May 19 and asked for "a

---

**2.** In this opinion, we shall refer to this Company offer as the "final offer."

few pennies" to end the strike. Lewis replied, "Roy, what you have here is a reasonable offer and it is a good one and if you want to move the money around it is okay with me but I am not giving one more cent." According to Albert's testimony before the ALJ, Lewis made no mention of the Company's planning to propose new non-economic terms. Lewis, to the contrary, testified that in this conversation he said: "We also have some new matters that are non-economic but I said I really think that it is inappropriate for you and I (sic) to discuss this."

On May 24, negotiator Ladov for the Company, wrote Logsdon, the International representative, to say that the parties had been "at a bargaining impasse" following the employees' rejection of the Company's April 29 offer; that the Company intended "to unilaterally implement the wage and economic benefits of [its] 'final offer,'" that the Company intended to resume operations on or about May 31; and that the Company would hire permanent replacements to the extent necessary to operate the plant.

On May 25, Mr. McSwiney for the Company mailed a similar letter to each unit employee. To both of these letters, the Company attached a copy of the Company's April 29 final offer. In the May 24 and 25 letters, the Company said that the April 29 offer was a "fair" one and that the Company "had decided to implement [its] economic terms and conditions." McSwiney further stated that he "did not believe our final offer was presented in the manner which enabled you to really judge its fairness" and that he "hoped the employees will take the time now to study the proposal very carefully." He concluded by expressing the "hope (that) you and your fellow employees realize the fairness of our final offer [offer of April 29] and decide to return to work next week."

The Union immediately called a meeting of the employees for May 26. At that meeting, Haney told the employees that they had to go back to work. They voted to do so but not until the following Tuesday after the Memorial Day holiday. They returned to work on that date. Logsdon called Ladov, told him that the strike was over and asked for a meeting "for the purpose of finalizing the agreement." Neither during that discussion nor any of the conversations between the Company and the unit negotiators did the Company negotiator state that the "final offer" was no longer open for acceptance.

The last meeting of the bargaining agents occurred on June 8. As the first order of business, Logsdon asked for amnesty with regard to any picket line misconduct during the strike. McSwiney replied for the Company that the Company would grant "general amnesty" which it would have granted even if the Union had not requested it. Logsdon then accepted the April 29 offer and offered to sign a contract then and there. Ladov replied that the relationship between the Union and the Company had been altered by the strike and that the Company was changing its proposal by deleting from the April 29 offer the sections dealing with Union security and the checkoff of Union dues that had been a part of the agreements for the past 30 years. The Company also proposed to add two clauses concerning the "purpose of agreement" and "grievance/arbitration" procedures that were part of the Company's opening proposal but were not included in the April 29 offer. Logsdon objected and charged the Company with trying to "bust the Union."

About this time, the Company, while continuing to deduct Union dues from the pay of employees who had executed dues checkoff authorizations, began to deposit the dues in an escrow account instead of transferring the money to the Union as provided under the expired contract.

## III. ISSUE

Whether substantial evidence supports the NLRB's finding that the April 29 offer remained open for acceptance until July 8.

## IV. DISCUSSION

■ The parties agree that the legal standard for determination of whether a

contract offer is still open for acceptance after rejection is controlled by *Georgia Kraft Co., Woodcraft Division v. NLRB,* 696 F.2d 931 (11th Cir.1983). In that case, this Court stated:

> In the collective bargaining setting '[a] contract offer is not automatically terminated by the other party's rejection or counterproposal, but may be accepted within a reasonable time unless it was expressly withdrawn prior to acceptance, was expressly made contingent upon some condition subsequent, or was made subject to intervening circumstances which made it unfair to hold the offeror to his bargain.'

*Georgia Kraft Co., Woodcraft Division v. NLRB,* 696 F.2d 931, 937–38 (11th Cir.1983) (quoting *Pepsi–Cola Bottling Co. of Mason City v. NLRB,* 659 F.2d 87, 89–90 (8th Cir.1981)), *vacated and remanded on other grounds,* 466 U.S. 901, 104 S.Ct. 1673, 80 L.Ed.2d 149 (1984). Here, it is clear that there was no express withdrawal of the final offer. During all of the discussions held between the parties, reference was made to the terms of the final offer on the assumption that it was still on the table. Moreover, in the letters sent by the Company to the negotiators and to the Union members, the Company expressed the hope that the Union would consider the offer a fair one, clearly giving the impression that its terms were still open for acceptance. Moreover, as noted by the Board in its decision, McSwiney's use of the present tense in the May 25 letter when referring to the final offer, indicated that the respondent considered the offer to be viable. The letter stated, "The Company believes that its proposal *is* fair to all concerned...."

█ We turn now to the question whether the offer was conditioned upon its being ratified by the Union membership. Assuming that the heading of the final offer became a part of the offer itself, we must determine what effect is given by the Board to such a conditional acceptance.

The General Counsel calls our attention to the Board decision in *Sacramento Union,* 296 NLRB, No. 65 (Sept. 5, 1989). In that case, the Board affirmed and adopted the rulings of the ALJ. The law judge discussed such a condition in his opinion:

> The Union's central role in contract formation is also apparent from the cases which deal specifically with ratification. Under the Act a labor organization has no obligation to submit an employer's proposal for a collective bargaining agreement to the represented employees or even its membership for ratification. *Norton County Motors Ltd.,* 146 NLRB 671 (1964). However, a labor organization may self impose such an obligation. The form of such an obligation can be by means of a constitutional or bylaw provision an ad hoc agreement with each represented group or a local policy decision. The Board has characterized self imposed ratification requirements as essentially a restriction on the authority or its negotiators to *execute* an agreement reached at the bargaining table absent the approval of its membership. *Joe Carroll Orchestra,* 254 NLRB 1158 (1981). An employer may impose a similar limitation on its negotiators. *University of Bridgeport,* 229 NLRB 1074 (1977). But a self imposed membership ratification requirement is not treated by the Board as the functional equivalent of the act of acceptance essential to the formation of a contract. Thus numerous board cases hold *that an employer may not question a gratuitously imposed ratification requirement in defense of its refusal to execute an agreement.* See, e.g., *Martin J. Barry Co.,* 241 NLRB 1011 (1979).... *C & W Lektra Bat Co., supra; M & M Oldsmobile,* 156 NLRB 901 (1966) (employer ordered to sign agreement even though union dispensed with earlier stated intent to obtain ratification where ratification looked impossible....

*Sacramento Union,* 296 NLRB, No. 65, ALJ Dec., p. 12, 13 (emphasis added).

Based on this late decision by the Board which fully supports the Board decision in the case now before us, we hold that respondent could not insist upon the ratification by the member of the bargaining

unit before a binding agreement could be formed.

This means that the final agreement was still on the bargaining table during the period of the strike.

We then must consider whether "intervening circumstances ... made it unfair to hold the offeror to his bargain." *Georgia Kraft Co., Woodcraft Div. v. NLRB, supra.* The law judge dealt with this matter:

> Here, there is some evidence that the Company believed that during the strike some employees resigned from the Union and "large numbers" told management of their desire to return to work and their displeasure with the Union. This "evidence" was presented as the basis for the Company's new desire to modify its offer in the areas of Union security and dues checkoff and it is analogous to reasons generally offered for withdrawal of recognition. Clearly, however, this belief is not objective reliable evidence that could support a good faith doubt that the Union continued to represent a majority of the employees and nothing is shown to have occurred that could justify the employer to withdraw recognition or withdraw from bargaining....

The ALJ found that labor relations had been excellent during the 30 years the employees were represented by the Union and concluded that nothing that had occurred during the strike materially changed that relationship.

The respondent also contends that when the notice was given by the Union negotiator Logsdon on June 8 that the Company accepted the "final offer," it was still subject to the condition subsequent of ratification by the members. As we have noted above, even if we assume that the heading of the final offer became a part of the offer itself, it did not become a condition of acceptance because it was only a self-imposed limitation on the authority of the negotiating team which it could waive if it saw fit.

█ On this appeal, the respondent claims there was no basis for the Board's decision that a final contract was accepted because there were still pending some non-economic issues. These issues principally related to the claim of the Union for amnesty for the striking employees. The Board found that this issue was separate and distinct from the contract negotiations. The Board stated in its order: "Even the respondent considered the amnesty request to be separate from the contract negotiations as evidenced by its accepting the amnesty request but rejecting the Union's acceptance of the final offer." We are satisfied that whether this discussion of non-economic benefits was separate from the main negotiations is an issue of fact and that there was sufficient evidence before the ALJ to support the Board's decision that it was separate and distinct.

Finally, there is no dispute about the fact that the respondent continued to deduct the dues from the payment of those Union members who authorized such a deduction and therefore there is no doubt about its obligation to pay over these funds to the Union for which they had been deducted.

## V. CONCLUSION

For the foregoing reasons, we affirm the Board's decision in full.

AFFIRMED.