**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**AUCIELLO IRON WORKS, INC., Respondent.**

No. 91–1905.

United States Court of Appeals, First Circuit.

Heard April 10, 1992.

Decided Nov. 30, 1992.

secured claim, which would not have been entitled to full payment in any chapter 7 distribu- tion.

John D. O'Reilly, III, with whom O'Reilly & Grosso, Framingham, Mass., was on brief, for respondent.

Collis Suzanne Stocking with whom Jerry M. Hunter, Gen. Counsel, D. Randall Frye, Acting Deputy Gen. Counsel, and Aileen A. Armstrong, Deputy Associate Gen. Counsel, Washington, D.C., were on brief, for petitioner.

Before SELYA, Circuit Judge
CAMPBELL, Senior Circuit Judge, and
KEETON,* District Judge.

LEVIN H. CAMPBELL, Senior Circuit Judge.

The National Labor Relations Board petitions for enforcement of its order issued against Auciello Iron Works, Inc., on June 27, 1991, pursuant to section.10(e) of the National Labor Relations Act, 29 U.S.C. § 160(e). We decline to enforce the order at this time, retain jurisdiction and remand for further proceedings.

## Background

Respondent, Auciello Iron Works, Inc. ("the Company"), is an employer engaged in commerce within the meaning of sections 2(6) and (7) of the National Labor Relations Act ("NLRA"). The Company operates an iron fabrication shop in Hudson, Massachusetts, and employs approximately 23 production and maintenance workers. In 1977, the National Labor Relations Board ("NLRB") certified the Shopmen's Local Union No. 501, a/w International Association of Bridge, Structural and Ornamental Iron Workers (AFL–CIO) ("the Union"), to be the exclusive collective bargaining representative of employees within a unit that included the Hudson facility's production and maintenance workers. Since 1977, the Company has negotiated and entered into

* Of the District of Massachusetts, sitting by designation.

several collective bargaining agreements with the Union.

On September 21, 1988, four days before the collective bargaining agreement then in effect was to expire, the Company and the Union began negotiations for a new agreement. The Union was represented in the negotiations by the International representative Robert Thomas, its local president David Mortimer, and one Joseph Parenti. The Company was represented by its attorney John D. O'Reilly, its controller Gerald Sauer, and its plant superintendent Manlio DeGrandis.

On September 30, 1988, the Company presented contract proposals and the parties discussed wages, medical insurance premiums and pension plans. Following the meeting, the Union's membership rejected proposals emerging from that meeting. Shortly thereafter, on October 4 or 5, 1988, representatives of the Company and the Union reviewed their respective positions. Thomas suggested to Company representative O'Reilly that if the Company would adopt the Union's contract proposal, there would be no need to submit it to the membership for a vote. Nothing came of this suggestion.

On October 13, 1988, the Company modified its proposals but the Union's negotiating team declined to accept them. It agreed, however, to submit the modified offer to the membership without a recommendation. The membership voted to reject the Company's offer and to strike the next day.

The Company and the Union met on October 18, 1988 with a federal mediator. The Union made a proposal which the Company declined. The stalemate continued through the parties' next meeting on October 26, 1988.

On November 17, 1988, the Company and the Union met again with a mediator. The Company made oral proposals on wages, overtime and medical insurance premiums, and written proposals on grievance arbitration, supervisory performance of unit work, and management rights. The written proposals contained changes from the expired contract. The Union team requested that it be allowed to caucus in order to study the proposals. After doing so, it decided it needed more time to consider them. The team asked for an adjournment of the bargaining session. The mediator advised the Company's representatives of this request. The Union negotiators then left the negotiating room, neither rejecting nor otherwise responding to the Company's proposals. The Company took no action to withdraw its offer.

Three days later, on November 20, 1988, Thomas, for the Union, telephoned Company representative O'Reilly to ask if there was any point in meeting again. O'Reilly replied that he did not envision any change in the Company's position. O'Reilly reported Thomas' call to controller Sauer. Nothing was said on behalf of the Company by way of withdrawing its November 17 proposals. After calling O'Reilly, Thomas telephoned Mortimer, the Union's local president, and informed him what had occurred. Thomas told Mortimer to advise the Union members to accept the Company's proposals of November 17 and to end the strike. Mortimer did so, and was able to reach eight to ten of the 23 employees.

On November 26, 1988, Mortimer reported to Thomas that the employees he polled had agreed to accept the Company's offer of November 17 and to return to work. On behalf of the Union, Mortimer sent the Company a telegram on November 27, 1988, stating:

> After careful consideration the proposed contract submitted by your company on November 17, 1988 to Local Union 501 has [been] unanimously ratified in its entirety by our negotiating committee. The strike at your plant has concluded as of this date and the employees have been advised to return to work on Monday November 28, 1988.

The Company's management representatives met to discuss their beliefs concerning the loyalties of various employees to the Union on November 28, 1988. After the meeting, the Company's attorney O'Reilly sent a telegram to the Union stating:

Employer position in response to your notice of November 27 is as follows: 1. Employer offer of November 17, was rejected by Local 501 and is no longer open for unilateral acceptance. 2. In any event your claimed ratification limited to the negotiating committee and excluding rank and file membership is insufficient. Employer now has reason to believe that Local 501 no longer represents a majority of the employees in the appropriate unit and therefore disavows any obligation to carry on further negotiations.

The strike ended as stated in the Union's telegram, but the Company refused to sign a contract with the Union based upon the November 17 proposals. The Union then filed an unfair labor practice charge and an amended charge with the NLRB against the Company on December 1, 1988, and January 17, 1989, respectively. In the charges the Union alleged that since November 28, 1988, the Company had refused to bargain with the Union in violation of section 8(a)(5) and (1) of the NLRA, by refusing to execute a collective bargaining agreement and by withdrawing recognition from the Union as bargaining agent for those unit employees.

The regional office of the NLRB issued an unfair labor practice complaint on January 17, 1989. Hearings were conducted before an Administrative Law Judge ("ALJ"). Sauer, the Company's controller, testified that on November 17 the Union negotiators had "stormed out" of the negotiating room without responding to the Company's proposals. He and Thomas both conceded, however, that the Union had not expressly rejected the Company's proposals. Sauer further conceded upon cross-examination that the Company had not removed its proposals from the bargaining table on November 17.

On November 24, 1989, the ALJ issued a decision concluding that the Company's November 17 proposal was still outstanding when the Union accepted it on November 26, hence the Company's later refusal to sign an agreement based upon this proposal, and its withdrawal of recognition, were refusals to bargain in violation of section 8(a)(5) and (1) of the NLRA, 29 U.S.C. § 158(a)(5) and (1).

The NLRB, without opinion, affirmed the ALJ's rulings, findings, and conclusions and substantially adopted his recommended order.[1] *See Auciello Iron Works, Inc.*, 303 NLRB No. 90 (1991). The Board ordered the Company to cease and desist from the unfair labor practices found, and required it, upon request of the Union, to put in writing, sign, and effectuate, retroactively to November 27, 1988, the collective bargaining agreement that the Union had accepted on that date. The order further required the Company to make whole, with interest, the employees to whom that agreement applied for lost wages and other benefits suffered as a result of the Company's refusal to execute the agreement.

The NLRB now seeks enforcement of that order.

I.

A. *Standard of Review*

 A court must enforce the Board's order if the Board correctly applied the law and if its findings of fact are supported by substantial evidence on the administrative record viewed as a whole. *Destilería Serralés, Inc. v. NLRB*, 882 F.2d 19, 21 (1st Cir.1989). Substantial evidence "is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Penntech Papers, Inc. v. NLRB*,

---

1. The Board stated in a footnote:

 We agree ... that under established Board precedent, once the Board finds that the parties have reached a binding collective-bargaining agreement, it is unnecessary to consider the issue of a respondent's alleged good-faith doubt of the union's majority status. *Belcon, Inc.*, 257 NLRB 1341, 1346 (1981); *North Bros. Ford*, 220 NLRB 1021, 1022 (1975). We also

 agree with the judge that the Board's decision in *Bickerstaff Clay Products*, 286 NLRB 295 (1987), [*enforcement denied*], 871 F.2d 980 (11th Cir.1989), in which the Board addressed the respondent's good-faith doubt defense even though the Board found that the parties had reached a binding agreement, did not overrule the precedent followed in *Belcon*.

706 F.2d 18, 22 (1st Cir.1983), *cert. denied,* 464 U.S. 892, 104 S.Ct. 237, 78 L.Ed.2d 228 (1983) (*quoting Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951)).

■ A court of appeals reviews the NLRB's orders with considerable deference. *NLRB v. Laverdiere's Enterprises,* 933 F.2d 1045, 1049 (1st Cir.1991). We will sustain inferences the Board reasonably draws from the facts, as well as its reasonable application of statutory standards to the facts and inferences. *Soule Glass & Glazing Co. v. NLRB,* 652 F.2d 1055, 1073 (1st Cir.1981). We may not substitute our judgment for the Board's when the choice is "between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo.*" *Universal Camera v. NLRB,* 340 U.S. at 488, 71 S.Ct. at 465.

### B. *The Duty to Bargain*

■ Under NLRA § 8(a)(5) and (1),[2] an employer has the obligation to bargain collectively with the representative of its employees. Section 8(d) of the Act, 29 U.S.C. § 158(d), provides that the duty to bargain includes the duty to "execut[e] ... a written contract incorporating any agreement reached if requested by either party." An employer commits an unfair labor practice in violation of section 8(a)(5) and (1) of the NLRA by refusing to sign a written contract incorporating agreed-upon terms or by otherwise repudiating an oral agreement. *NLRB v. Strong,* 393 U.S. 357, 359, 362, 89 S.Ct. 541, 543, 545, 21 L.Ed.2d 546 (1969); *H.J. Heinz Co. v. NLRB,* 311 U.S. 514, 525–526, 61 S.Ct. 320, 325, 85 L.Ed. 309 (1941); *NLRB v. Crimptex, Inc.,* 517 F.2d 501, 505–06 (1st Cir.1975).

The Company argues that in the circumstances of this case it did not commit an unfair labor practice by refusing to sign a collective bargaining agreement based on the Union's acceptance on November 27 of its November 17 offer, and by withdrawing recognition from the union. It contends that the offer made on November 17 was no longer available when the Union's negotiating committee accepted it; that the committee's acceptance never resulted in a binding agreement because the Union's membership never ratified the purported agreement; and that the Company properly withdrew recognition from the Union because it believed, in good faith, founded on reasonable and objective factors, that the Union, in fact, clearly no longer represented a majority of the unit employees. We consider these arguments in turn.

### II.

### A. *Whether the November 17 offer was still available when the Union accepted it*

■ Although not bound by all the technical rules of contract law, the NLRB is free to fashion and apply general contract principles in the collective bargaining context. *NLRB v. International Bhd. of Elec. Workers Local 22,* 748 F.2d 348, 350 (8th Cir.1984); *Pepsi–Cola Bottling Co. v. NLRB,* 659 F.2d 87, 89 (8th Cir.1981); *NLRB v. Electra–Food Mach., Inc.,* 621 F.2d 956, 958 (9th Cir.1980). The Board and courts have held that "[i]n the collective bargaining context, an offer will remain on the table unless the offeror explicitly withdraws it or unless circumstances arise that would lead the parties to reasonably believe that the offeror has withdrawn the offer." *NLRB v. Burkart Foam, Inc.,* 848 F.2d 825, 830 (7th Cir.1988); *see Wil-*

---

**2.** These sections provide:
 (a) It shall be an unfair labor practice for an employer—
 (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

 . . . . .

 (5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title. 29 U.S.C. § 158(a)(1) and (5).

*liamhouse–Regency, Inc. v. NLRB,* 915 F.2d 631, 634–635 (11th Cir.1990).

Here the ALJ, in findings affirmed by the Board, found "neither evidence nor contention" of express withdrawal by the Company prior to the Union's November 27 acceptance. Similarly, the ALJ found that nothing in the Company's or Union's conduct or reaction prior to the Union's November 27 acceptance suggested that the parties believed, or had reason to believe, the offer of November 17 had been rejected, withdrawn or ceased to be open for acceptance.

We accept these findings as they are amply supported by substantial evidence in the record. The Company contends that the Union delegation's "storming out" of the November 17 meeting without setting another meeting date or saying farewell was an "extremely negative response" which led management to infer a rejection of its proposal. However, the absence of any reference to withdrawal or rejection of the proposal in conversations between Thomas and O'Reilly on November 20 caused the ALJ to doubt that the employer believed its proposals had been rejected. In factual matters of this nature, we defer to the Board's resolution. The ALJ also thought, we think reasonably, that a mere uncommunicated, unilateral judgment by the Company that rejection had occurred would, by itself, be ineffective to remove its proposal from the table. We find no error. The Board acted well within its authority in finding that the offer of November 17, 1988, was still on the table when the Union's negotiating committee purported to accept it by telegram on November 27, 1988.

### B. *Ratification*

■ The Company argues that no valid contract was ever entered into with the Union because the Union negotiating committee's acceptance of the November 17 proposal was never ratified by the Union members. The ALJ, in an analysis adopted by the Board, rejected this contention, finding that there was no express or implied mandate or agreement making membership ratification a precondition to a binding collective bargaining contract.

The NLRB has consistently held that unless parties have explicitly agreed that any agreement between the negotiators must be ratified by the employees, the formality of a vote is not required to create a binding agreement. *Newtown Corp.,* 280 NLRB 350 (1986), *enforced,* 819 F.2d 677 (6th Cir. 1987); *Consumat Sys., Inc.,* 273 NLRB 410, 413 (1984); *Martin J. Barry Co.,* 241 NLRB 1011, 1013 (1979), *later proceeding,* 278 NLRB 393 (1986); *see also Houchens Mkt., Inc. v. NLRB,* 375 F.2d 208, 212 (6th Cir.1967) ("[W]hether or not [the] bargaining unit may enter into a binding contract with or without membership ratification ... is not an issue which the Company can insist upon without mutual agreement by the Union....")

The ALJ found, and it is undisputed, that neither the Iron Workers' International constitution nor the by-laws of the local union contain any provision requiring membership ratification of a collective bargaining agreement. The ALJ also found that there were no explicit discussions between the Company and the Union during the 1988 negotiations in which the Union advised the Company that membership ratification was needed to establish a contract. While there was evidence that membership votes were taken in 1988, and possibly before, the ALJ concluded, and the Board agreed, that such submission to membership votes fell short of establishing that ratification was a pre-condition to the formation of a binding agreement. While another determination might be possible, we think this conclusion was within the authority of the Board to reach on this record.

### C. *The Company's good faith belief that the Union no longer represented the majority of employees as a basis to withdraw recognition from the Union*

■ The Company's most serious contention is that the Board erred in refusing to consider the Company's argument that, in declining to recognize the Union or to bargain further with it, the Company was acting pursuant to a well-supported good faith

doubt that the Union still had majority support among those it supposedly represented. The Company first made this contention in a telegram sent on November 28, one day after the Union's negotiating committee had telegraphed its acceptance of the Company's outstanding offer of November 17. The Company points to various facts, all of which apparently occurred prior to the negotiating committee's November 27 acceptance, as indicative of the Union's loss of majority support. Among other things, the Company asserts that some nine unit employees crossed the picket line on a daily basis during the strike; that as many as 13 of the original bargaining unit personnel had submitted resignations to the Union; and that 16 original unit employees had indicated that they did not support the Union.

The ALJ, however, refused to consider whether or not the Company's alleged good faith doubt, manifested on November 28, was justified by evidence indicating the Union had, in fact, lost majority status. He relied upon the Board's decision in *Belcon, Inc.*, 257 NLRB 1341 (1981), for the proposition that, once a union has accepted the employer's contract offer, thus establishing a binding contract between the parties, the employer may not decline to bargain with the union under the terms of the contract on grounds of a good faith doubt of majority status.

The Board confirmed the ALJ's determination, reiterating its support for the *Belcon* doctrine. *See supra* note 1. The Board's position, which it reiterated in its argument before us, goes back to NLRB decisions rendered in the 1970s: *North Bros. Ford, Inc.*, 220 NLRB 1021 (1975), and *Utility Tree Serv., Inc.*, 215 NLRB 806 (1974), *supp. op.*, 218 NLRB 784 (1975), *enforced*, 539 F.2d 718 (9th Cir.1976). In *North Bros. Ford*, the Board ruled that once a "final agreement on the substantive terms [of the collective bargaining agreement is] reached, and regardless of the status of any written instrument incorporating that agreement, [the employer is] not free to refuse to bargain even if it has lawful grounds for believing that [the Union] has subsequently lost its majority sta-

tus." *North Bros. Ford*, 220 NLRB at 1022.

■ Underlying the Board's rationale is the so-called contract bar rule, a Board-created rule that once an employer and a union enter into a valid collective bargaining contract, the majority status of the union is presumed for the duration of the contract, not to exceed three years. *El Torito–La Fiesta Restaurants, Inc. v. NLRB*, 929 F.2d 490, 492–93 (9th Cir.1991); *Pioneer Inn Assocs. v. NLRB*, 578 F.2d 835, 838 (9th Cir.1978). The rule has been applied by the Board to prevent challenges to a union's majority status "even if a majority of the employees withdraw their support." *Pioneer Inn Assocs.*, 578 F.2d at 838.

In *North Bros. Ford*, the employer's good faith doubt centered on the union's loss of majority status occurring *after* the making of the contract. *See* 220 NLRB at 1021–22. *Belcon* was not expressly so limited, however, *see* 257 NLRB at 1346–47, and in cases like the present, the Board apparently believes that even if the Union lacked majority status at the very moment its negotiating committee accepted the employer's offer, a completed contract should be presumed, barring the employer from thereafter questioning the union's lack of majority support. *Chicago Tribune Co.*, 303 NLRB No. 106 (1991), *enforcement denied*, 965 F.2d 244 (7th Cir.1992).

There is an obvious chicken-egg problem in this approach. If the Union in fact lacked majority status at the time of acceptance, should its acceptance be held to create a valid and binding contract that bars the employer from thereafter questioning the existence of majority status at that critical earlier time? The closest thing to a relevant justification of the Board's approach appears in the ALJ's opinion (subsequently reversed by the Seventh Circuit) in *Chicago Tribune*. The ALJ wrote:

There is no reliable authority for the proposition that an employer may invoke a refusal to bargain or withdrawal of recognition after a contract has been reached. Good faith doubt is a difficult

enough concept to litigate when alleged doubts are expressed in the form of a refusal to bargain; it would be an impossible concept to litigate if it could be invoked after a contract is reached and in the absence of a prior refusal to bargain not only to vitiate that contract but to dissolve the bargaining relationship. This would permit an employer to litigate an alleged doubt as it might have existed in his own mind at the time a contract was reached rather than at the time of an objective event, that is, a refusal to bargain or withdrawal of recognition. The cases do not permit such a subjective inquiry.

The Board in *Chicago Tribune* proceeded on the basis of the ALJ's opinion, without attempting any further explanation of its own. In briefs and argument before us, Board counsel made no mention at all of the decisions so far rendered in *Chicago Tribune*, and neither the ALJ nor the Board here have attempted to address the employer's argument that the contract bar rule should not be applied to prevent an employer from attempting to question *the very existence and validity of a contract* for lack of majority status.

Even more troublesome, after argument in April 1992, neither party advised us that, on May 29, 1992, the Seventh Circuit had refused to enforce the bargaining order in *Chicago Tribune*. *Chicago Tribune Co. v. NLRB*, 965 F.2d 244 (7th Cir.1992), *reh'g denied*, Nos. 91–2750, 91–2916 (June 24, 1992). The Seventh Circuit's analysis has direct bearing here. Writing for the panel, Judge Posner refused to accept "the Board's rule that a union's unconditional acceptance of an offer for a collective bargaining contract is valid and binds the company unless circumstances have changed since the company's offer was made or renewed ... where between the original offer and its renewal the union lost the support of the workers." *Chicago Tribune*, 965 F.2d at 250. The Seventh Circuit reasoned that while the employer might have been at fault for leaving its offer on the table, the interests of the unrepresented majority—who had not desired representation by the union at the time the contract

was supposedly agreed to—could not properly be sacrificed to the interests of the repudiated union and to whatever considerations might support holding that the employer had waived his rights. *See id.* The Seventh Circuit relied upon *International Ladies' Garment Workers' Union v. NLRB*, 366 U.S. 731, 81 S.Ct. 1603, 6 L.Ed.2d 762 (1961), forbidding a company to sign a collective bargaining contract with a union that it knows does not have the support of a majority of the workers in the bargaining unit. *See Chicago Tribune*, 965 F.2d at 249–51.

In their briefs and argument before us, the parties did not explore to any degree the pros and cons of applying the contract bar rule against an employer on the basis of a contract made by a union that, at the time it accepted the employer's offer, may have lacked majority support. The Company raised the point, however, noting that in *North Bros. Ford* the loss of support had occurred only *after* the making of the contract and, on that basis, arguing for release from the contract bar rule.

We find disappointing the Board's failure to recognize that the mere rote citation of *North Bros. Ford* and *Belcon* does not answer the Company's contention. The Board seems to have mechanically applied what Judge Posner aptly terms, "the beguiling syllogism: an offer not withdrawn can be accepted at any time provided there are no changed circumstances; an agreement once accepted must be signed; a signed agreement creates an irrebuttable presumption that the union has majority support." 965 F.2d at 250 (citations omitted). The Board has glossed over the analytically tough question presented here: should the making of a contract be irrebuttably presumed for purposes of the contract bar rule where the creation of the alleged contract, by the union's acceptance of the employer's offer, may have come at a time the union lacked majority support? The ALJ in *Chicago Tribune* believed it would be impracticable not to presume a valid contract even in those circumstances. The Seventh Circuit held, to the contrary,

that that approach conflicted with the firmly established principle that an employer may not contract with a minority union. *See* 965 F.2d at 250.

The National Labor Relations Board has the chief responsibility for developing coherent and correct labor negotiating rules. Especially as the relevant principles here are informed less by statutes than by Board policies set out in its decisions, the area is one where the Board's presumed expertise is key. Yet the Board cannot provide meaningful leadership through rote, unthinking, unexplained applications. The fitful quality of the Board's attention in the instant area was shown in two recent cases cited here by the Company, in which the Board appears to have overlooked altogether its *North Bros. Ford* and *Belcon* precedent. In enforcement proceedings culminating in *NLRB v. Curtin Matheson Scientific, Inc.*, 494 U.S. 775, 110 S.Ct. 1542, 108 L.Ed.2d 801 (1990), and *NLRB v. Bickerstaff Clay Prods. Co.*, 871 F.2d 980 (11th Cir.1989), *cert. denied*, 493 U.S. 924, 110 S.Ct. 292, 107 L.Ed.2d 272 (1989), the Board, without comment, allowed an employer to litigate an issue of good faith doubt *after* the union had accepted an outstanding offer. Without mentioning the *Belcon* doctrine, the Board plunged into the merits of the employer's asserted good faith doubt. *See Curtin Matheson Scientific, Inc.,* 287 NLRB 350 (1987), *enforcement denied*, 859 F.2d 362 (5th Cir.1988), *rev'd*, 494 U.S. 775, 110 S.Ct. 1542, 108 L.Ed.2d 801 (1990); *Bickerstaff Clay Prods. Co.*, 286 NLRB 295 (1987), *enforcement denied*, 871 F.2d 980 (11th Cir.1989), *cert. denied*, 493 U.S. 924, 110 S.Ct. 292, 107 L.Ed.2d 272 (1989). The Board now suggests various reasons for its oversight in those cases, insisting that it was not deliberately abandoning *Belcon*. We accept the Board's insistence as true. We are not persuaded by the Company's arguments that *Belcon* was knowingly abandoned or that the Supreme Court, in *Curtin Matheson*, tacitly overruled it. What occurred looks like an unwitting oversight

encouraged, perhaps, by a readiness to circumvent precedent in order to secure review of an important substantive issue. But the course taken does not reflect much credit on the Board. Employers and unions are entitled to expect an even-handed application of the rules announced in the Board's prior administrative decisions. If the Board and its General Counsel do not remember and follow Board precedent, how can others be expected to do so? And if, when the Board undertakes to apply its precedent, it does so, as here, without bothering to explain applications in factually distinguishable circumstances, it weakens the credibility of its policies.

The Board's conclusory ruling in the present case simply failed to address the argument that acceptance of an outstanding offer by a *minority* union should not be deemed to establish a valid collective bargaining agreement that forever bars the employer from raising a good faith doubt. The Board nowhere addressed the Company's argument that a lack of majority status on the date the Union purported to accept the Company's outstanding offer should be distinguished from a good faith doubt of majority status based on events occurring *after* a valid contract was made. Can acceptance by an unrepresentative minority union create a binding contract? [3] Particularly in light of the Seventh Circuit's decision in *Chicago Tribune*, we think the Board must revisit, clarify and explain the principles that it thinks apply in the present circumstances. We do not say its ultimate result need necessarily be different from what it was here. We are not ready to say that the Seventh Circuit's analysis should apply, nor, indeed, that we adopt the Seventh Circuit's holding in *Chicago Tribune*. This is an area where the courts should tread softly, with considerable deference to the Board's reasoned analysis. In the practical arena of labor negotiations, the Seventh Circuit's analysis may still be found wanting as a yardstick. But the Board, by default, has left us without

3. We do not, of course, say that the Union necessarily lacked majority support here. The ALJ expressly refrained from making findings

as to that issue, relying instead on the contract bar rule to prevent the employer from raising the matter.

the policy guidance and reasoned analysis needed to decide the issue. The question is not a purely legal one, but calls for the Board's reasoned application of its expertise. Reviewing courts are entitled to have that expertise demonstrated in a meaningful Board opinion, rather than in a laconic rule of thumb presented without reasoning and without attention either to the employer's arguments or to underlying policy concerns (such as the attention due to the rights of unrepresented workers).

■ A court may require that the Board's decision "be supported by articulate, cogent, and reliable analysis." *Northport Health Servs., Inc. v. N.L.R.B.*, 961 F.2d 1547, 1553–54 (11th Cir.1992); *accord Williams Enters., Inc. v. N.L.R.B.*, 956 F.2d 1226, 1235–36, 1240 (D.C.Cir.1992); *Hyatt Corp. v. N.L.R.B.*, 939 F.2d 361, 367–68, 376 (6th Cir.1991); *Pacific Northwest Newspaper Guild, Local 82 v. N.L.R.B.*, 877 F.2d 998, 1001–03 (D.C.Cir. 1989); *Teamsters Local Union 171 v. N.L.R.B.*, 863 F.2d 946, 957–59 (D.C.Cir. 1988), *cert. denied sub nom. A.G. Boone Co. v. N.L.R.B.*, 490 U.S. 1065, 109 S.Ct. 2063, 104 L.Ed.2d 628 (1989); *Hotel Holiday Inn de Isla Verde v. N.L.R.B.*, 723 F.2d 169, 172–73 (1st Cir.1983).

Accordingly, while we shall retain jurisdiction, we remand to the Board for its further consideration.[4] We direct the Board to hear additional argument from the parties on the principles to be applied where, after the Union's supposed acceptance, an employer seeks to present evidence that at the time of the Union's acceptance, it lacked majority support. Following argument, the Board should issue a reasoned opinion stating the appropriate rule or rules it proposes to apply, and resolving that question here in accordance with those articulated principles. As we have said, the Board's result may or may not be the same as before. However, the Board's opinion should include a discussion of the Seventh Circuit's ruling in *Chicago Tribune*, and of the legal and policy principles (as well as practicalities) it believes are controlling, and of the application of those considerations to the facts. While we set no specific time limit, we ask the Board to act with expedition, and to send a certified copy of the record and its opinion and further order to the clerk of this court as soon as it can.[5]

For the sake of clarity, we reiterate that we are prepared to enforce the Board's determinations, (a) that the Company's offer remained open and "available" on November 27, when the Union purported to accept it; and (b) that membership ratification *per se* was not a requirement. Our doubt focuses on whether and why the employer should not be allowed to try to show that, at the time of the Union's purported acceptance of the Company's outstanding offer, the Union was lacking in majority support and therefore incapable of creating by its acceptance a valid contract.

*We decline to enforce the order at this time, and the cause is remanded to the Board for further proceedings consistent herewith, with jurisdiction to be retained by this court.*

---

**4.** Under the statute granting this court jurisdiction to entertain petitions for enforcement of Board orders, the court has the "power to grant such temporary relief or restraining order as it deems just and proper, and to make and enter a decree enforcing, modifying, and enforcing as so modified, or setting aside in whole or in part the order of the Board." 29 U.S.C. § 160(e). This power has been applied to authorize remand to the Board for further proceedings pursuant to the court's opinion while retaining jurisdiction. *See, e.g., N.L.R.B. v. New York Univ. Medical Ctr.*, 702 F.2d 284, 299 (2d Cir.1983) (remanding to Board, while retaining jurisdiction, for application of proper legal standard),

*vacated on other grounds*, 464 U.S. 805, 104 S.Ct. 53, 78 L.Ed.2d 73 (1983); *N.L.R.B. v. Mount Desert Island Hosp.*, 695 F.2d 634, 642 (1st Cir. 1982); *New Alaska Dev. Corp. v. N.L.R.B.*, 441 F.2d 491, 495 (7th Cir.1971) (retaining jurisdiction and remanding for required detailed factual findings).

**5.** In the event the Board determines that further fact-finding is required, necessitating a remand to the ALJ, we direct the Board to notify us to this effect and authorize the Board to then move to terminate our retained jurisdiction over the present enforcement petition.