## NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

## BOSTON DISTRICT COUNCIL OF CARPENTERS, Affiliated with United Brotherhood of Carpenters and Joiners of America and Carpenters Local Union No. 33, Affiliated with United Brotherhood of Carpenters and Joiners of America, AFL–CIO, Respondent.

No. 95–1762.

United States Court of Appeals,
First Circuit.

Heard Feb. 9, 1996.

Decided April 10, 1996.

Christopher N. Souris, with whom Feinberg, Charnas & Birmingham, Boston, MA, was on brief for respondent.

Christopher W. Young, Attorney, with whom Frederick L. Feinstein, General Counsel, Linda Sher, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, and Frederick C. Havard, Supervisory Attorney, Washington, DC, were on brief for petitioner.

Before CYR, BOUDIN and STAHL, Circuit Judges.

CYR, Circuit Judge.

The National Labor Relations Board petitions for enforcement of its order directing the Boston District Council of Carpenters ("Union") to execute a collective bargaining agreement ("CBA") with the charging party Curry Woodworking, Inc. ("Curry"). As we conclude that there is substantial evidentiary support for the Board order, we grant the petition for enforcement.

# I

## *BACKGROUND*

The Union, a "labor organization" within the meaning of the National Labor Relations Act ("NLRA"), *see* 29 U.S.C. § 152(5) (1994), is the central governing body for nine local

unions affiliated with the United Brotherhood of Carpenters & Joiners of America. The Union exercises the collective bargaining authority of its constituent locals in negotiating a CBA, known as a Master Agreement ("MA"), with several multiemployer associations. Once a MA has been negotiated with these multiemployer associations, the Union customarily offers the same MA to other area employers, including those which neither belong to a multiemployer association nor otherwise participate in negotiations. These nonparticipating employers may bind themselves to the negotiated MA simply by executing what are known as "me too" acceptances, which give rise to prehire agreements authorized under NLRA § 8(f).[1]

Curry was formed in 1990 and, on August 23, 1990, became a "me too" signatory to its first MA with the Union, which covered Curry's four unionized installers but not its thirteen nonunion architectural millworkers. The Union and the multiemployer associations subsequently executed a new MA for the period August 1, 1991 to May 31, 1993, which Curry joined on August 14, 1991. In order to foreclose any continuation of the 1991–93 MA *beyond its term*, in March 1993 the Union advised Curry that it intended to negotiate changes in the next MA. As the May 31, 1993, expiration date approached, the Union and the multiemployer associations again negotiated a successor MA—for the period June 1, 1993, through September 30, 1997.

On May 28, 1993, the Union offered the new MA to approximately 135 "me too" employers, including Curry, and advised: "Unless this office receives a duly authorized Acceptance of Agreement *by June 4, 1993, your company will be considered not to have a collective bargaining agreement with the*

*[Union]*." (emphasis added). On *June 22,* Curry signed, dated, and mailed its Acceptance of Agreement to the Union. On June 23, a Union representative called Curry to inquire whether its acceptance form had been signed. Although the Union representative voiced no concern or objection upon learning that the acceptance had been mailed, the Union never executed a successor MA with Curry.

 Curry continued to utilize its unionized installers to perform work throughout June and July 1993, *before* the wage and benefit increases under the new MA were to take effect. On August 2, however, one day after the wage and benefit increases under the new MA went into effect, the Union refused to sell Curry fringe benefit stamps, which employers include in the pay envelopes of their unionized employees as evidence that the employer has made the appropriate contributions to the Union's collection agency. As a practical matter, without fringe benefit stamps Curry was unable to retain the services of its unionized installers.[2] Curry complained to Union officials but was advised that the Union believed it had no legal obligation to execute a new MA with Curry, and would not do so unless Curry's architectural millworkers were unionized.

After Curry filed an unfair labor practice charge against the Union, the Board issued a complaint alleging that the Union had violated NLRA § 8(b)(3) by failing to execute and honor the terms of the new MA.[3] The Union denied the charge. An administrative law judge ("ALJ") concluded that the May 28 letter did not constitute a binding offer by the Union, and, in the alternative, that it had

---

**1.** 29 U.S.C. § 158(f) (1994). See *C.E.K. Indus. Mechanical Contractors v. NLRB*, 921 F.2d 350, 356–59 (1st Cir.1990), for a discussion of prehire agreements.

**2.** Although the new MA had not been executed with four other employers by August 1, those employers eventually worked out their differences with the Union. In the end, Curry was the only former signatory with which the Union did not enter into the 1993–97 MA.

**3.** "It shall be an unfair labor practice for a labor organization or its agents ... to refuse to bargain

collectively with an employer...." 29 U.S.C. § 158(b)(3) (1994). The duty to engage in collective bargaining includes the duty to execute a written contract, upon request, incorporating any agreement. *NLRB v. Auciello Iron Works, Inc.*, 980 F.2d 804, 808 (1st Cir.1992) (citing *NLRB v. Strong*, 393 U.S. 357, 359, 362, 89 S.Ct. 541, 543–44, 545, 21 L.Ed.2d 546 (1969)), *opinion after remand*, 60 F.3d 24 (1st Cir.1995), *cert. granted*, —— U.S. ——, 116 S.Ct. 805, 133 L.Ed.2d 752 (1996).

expired by its terms on June 4, before it was accepted by Curry.

The Board rejected the finding that the Union offer expired on June 4, because (1) the Union had expected to receive many acceptances after June 4; (2) the Union did receive post-June 4 acceptances from almost half the "me too" employers with whom it later executed the new MA; (3) the Union made a systematic effort to contact employers, including Curry, from whom it had not received acceptances by June 4; and (4) the May 28 letter did not explicitly state that the offer to execute the new MA would *expire* on June 4. *Carpenters Local 33*, 316 N.L.R.B. 367, 369–70 (1995), 1995 WL 72412, at *3–4. The Board accordingly ruled that the Union had violated NLRA § 8(b)(3) and ordered the Union to execute the new MA with Curry. *Id.* at 370, 1995 WL 72412, at *4–5.

## II

### *DISCUSSION*

As the Board is primarily responsible for developing and applying a coherent national labor policy, *NLRB v. Curtin Matheson Scientific, Inc.*, 494 U.S. 775, 786, 110 S.Ct. 1542, 1549, 108 L.Ed.2d 801 (1990), we accord its decisions considerable deference. *Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 42, 107 S.Ct. 2225, 2235, 96 L.Ed.2d 22 (1987). Thus, we will enforce the order if the Board correctly applied the law and if its findings of fact are supported by substantial evidence based on the record as a whole. *NLRB v. Auciello Iron Works, Inc.*, 980 F.2d 804, 807 (1st Cir.1992), *opinion after remand*, 60 F.3d 24 (1st Cir.1995), *cert. granted*, —— U.S. ——, 116 S.Ct. 805, 133 L.Ed.2d 752 (1996); 29 U.S.C. § 160(e) (1994). The evidence relied on by the Board must be adequate to enable a reasonable mind to consider it sufficient to support the Board's conclusion. *Auciello*, 980 F.2d at 807. Accordingly, we must take into account whatever in the record evidence fairly detracts from the Board's factual findings, and examine it in the light furnished by the entire record, including the ALJ's findings and any other evidence opposed to the Board's view. *C.E.K. Indus. Mechanical Contractors v. NLRB*, 921 F.2d 350, 355 (1st Cir.1990); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951). Yet we may not "substitute our judgment for the Board's when the choice is 'between two fairly conflicting views, even though [we] would justifiably have made a different choice had the matter been before [us] *de novo.*'" *Auciello*, 980 F.2d at 808 (quoting *Universal Camera*, 340 U.S. at 488, 71 S.Ct. at 465).

With the analytic framework in place, we turn to the only issue in the case: whether the Board supportably determined that the May 28 Union offer to Curry did not expire on June 4. The Union mounts a plain language argument based on the express terms of the May 28 letter, whereas the Board emphasizes the broader context within which the offer was made.

The argument advanced by the Union—that it had the right to shape the terms of its offer to Curry, *see, e.g.*, 1 Arthur L. Corbin, *Corbin On Contracts* § 2.14 (Joseph M. Perillo ed., 1993), is not readily dismissed in the face of the language it used in the May 28 letter to Curry: "Unless this office receives a duly authorized Acceptance of Agreement by June 4, 1993, [Curry] will be considered not to have a collective bargaining agreement with the [Union]." Yet for all its literal force the plain language argument must contend with the settled labor law principle that a CBA is not just another contract. *John Wiley & Sons v. Livingston*, 376 U.S. 543, 550, 84 S.Ct. 909, 914–15, 11 L.Ed.2d 898 (1964).

The prevailing rule, in this and other circuits, provides that technical rules of contract interpretation are not necessarily binding on the Board in the collective bargaining context, *Auciello*, 980 F.2d at 808, even though it is free to apply general contract principles so as to foster the established federal labor policy favoring collective bargaining. Thus, we have held that "'[i]n the collective bargaining context, an offer will remain on the table unless the offeror explicitly withdraws it or unless circumstances arise that would lead the parties to reasonably believe that the offeror has withdrawn the offer.'" *Id.* (quoting *NLRB v. Burkart Foam, Inc.*, 848 F.2d 825, 830 (7th Cir.1988)).

The Board urges us to apply the same rule in this case.

Although myriad cases involve rejections and counteroffers, there is a notable lack of appellate authority on what constitutes an express withdrawal of an offer in the collective bargaining context. For example, in *Auciello*, unlike the present case, the company placed no express time limit on its offer to the union, instead contending that the union had rejected the company offer simply by "storming out" of a bargaining session. This court found that the Board sensibly had concluded that "a mere uncommunicated, unilateral judgment by the Company that rejection had occurred would, by itself, be ineffective to remove its proposal from the table." *Id.* at 809. The nature of the dispute in *Auciello*, and other cases, *see, e.g., Williamhouse–Regency of Del., Inc. v. NLRB*, 915 F.2d 631, 633–35 (11th Cir.1990) (company revived terminated offer); *Pepsi–Cola Bottling Co. v. NLRB*, 659 F.2d 87, 90 (8th Cir.1981) (company offer at beginning of a strike did not *imply* a condition of immediate acceptance), is materially different from the present dispute, which turns principally on an interpretation of the terms of the written offer itself.

Our research discloses that the Board consistently has acknowledged that an offeror may impose an explicit temporal limit on an offeree's right to accept an offer to enter into a CBA. For example, in *J. Hofert Co. v. International Woodworkers of America, Local 3–38, AFL–CIO*, 269 N.L.R.B. 520, 520 (1984), 1984 WL 36313, at \*1, the Board found that the following language unequivocally limited a contract offer at the time it was made: "This proposal will be open through Wednesday [7 October 1981] after which date it will be withdrawn if it has not been accepted." The Board later followed *J. Hofert Co.* in ruling that "a party ... may condition [its] offer upon acceptance by a specified deadline, thereby precluding the making of a contract if the other party fails to accept prior to the deadline. In such a case, the offer is construed as being withdrawn if acceptance does not come by the

expressed deadline." *Inner City Broadcasting Corp.*, 281 N.L.R.B. 1210, 1216 (1986), 1986 WL 54460, at \*10. Although we find *J. Hofert Co.* and *Inner City Broadcasting* instructive, we nonetheless agree with the Board that the language of the Union offer in this case imposed no unequivocal temporal limitation on the offeree's right to accept the offer, thus leaving the offer open to the interpretation given it by the Board.

### 1. *The Language of the Offer*

The May 28 letter stated that unless the Union received an Acceptance of Agreement by June 4, the offeree would "not ... have a collective bargaining agreement" with the Union. The ALJ found this language sufficiently definite to terminate the right to accept on June 4. The Board disagreed, because the "letter *does not state specifically* that execution by June 4 was a condition of acceptance or that the offer would be withdrawn on that date." *Carpenters Local 33*, 316 N.L.R.B. at 369, 1995 WL 72412, at \*4 (emphasis added).

As the Board supportably determined, there is a significant difference—particularly in the context of this case—between stating that the parties will not be cooperating under any CBA unless Curry accepts the Union offer by June 4 and stating that the offer to enter into a *new* CBA expires on June 4.[4] The Board reasonably construed the temporal reference in the Union offer to mean that the parties' labor-management relations would be subject neither to the MA which expired on May 31, nor to the proposed new MA, unless the offer were accepted by Curry by June 4. The Union, on the other hand, interprets the May 28 letter as foreclosing any subsequent acceptance of the Union offer by Curry after June 4. Although the language itself might accommodate either interpretation, depending on the context in which used, it is the Union interpretation, not the Board's, which goes somewhat beyond the literal purport of the offer. That is to say, in a nutshell, the literal language of the offer was ambiguous as to the *consequences* of an offeree's failure to accept

---

4. At oral argument, the Board conceded that the Union would have had no obligation to enter into a new MA with Curry had its May 28 letter expressly stated that the offer expired on June 4. Its concession is consistent with the Board precedents discussed above. *See supra* p. 666.

by June 4. As to this critical matter, it was eminently reasonable for the Board to look to any relevant prior course of dealing among the parties.

### 2. *The Course of Dealing*

Accordingly, the Board examined relevant prior dealings among the parties with a view to informing the language of the offer, especially their prior practice regarding "late" acceptances. Their prior practice provided strong support for the Board finding that the May 28 offer is most faithfully interpreted as enabling its acceptance for a reasonable time after June 4 unless withdrawn by the Union before acceptance. For example, the 1991 Union offer, expressed in virtually identical terms, stated as follows: "Unless this office receives a duly authorized Acceptance of Agreement by July 31, 1991, your company will be considered to be a company which does not have a collective bargaining agreement with the [Union]." Significantly, Curry did not accept the 1991 offer until August 14, 1991. Given the parties' prior practice of submitting and honoring "late" acceptances, we think the Board permissibly concluded that the Union had not unambiguously announced in its May 28 offer an intention to depart from its prior practice regarding "late" acceptances.

Other circumstantial evidence lends similar support to the Board decision. First, the Union anticipated that it would receive acceptances before and after June 4, and ultimately executed the new MA with every employer except Curry, some of whom accepted well after Curry. Second, the Union's efforts to contact Curry, and other companies that had not accepted by June 4, likewise indicates that the Union did not regard June 4 as a firm deadline for acceptance. Although the other evidence is not entirely inconsistent with the Union contention that the Curry acceptance was untimely, neither the evidence nor the language of the offer clearly indicated that the Union offer terminated on June 4. In such a case, we will not disturb the Board's choice between permissible conflicting views, *C.E.K. Contractors,* 921 F.2d at 355, particularly where the literal language of the offer and the course of dealing evidence provide strong support for the Board interpretation. Finally, the strong public policy favoring collective bargaining agreements as the preferred means of fostering industrial peace appears well served by the Board ruling in the instant context. *Local 24, Int'l Bhd. of Teamsters v. Oliver,* 358 U.S. 283, 295, 79 S.Ct. 297, 304, 3 L.Ed.2d 312 (1958).

### III

### *CONCLUSION*

In sum, the Board acted well within the bounds of its considerable discretion. Viewed in its entirety, the record contains substantial evidentiary support for the interpretation that the Union offer did not expire by its own terms on June 4. Moreover, viewed in light of the prior dealings among the parties, especially their prior practice of submitting and honoring "late" acceptances, as well as the strong public policy favoring collective bargaining, we conclude that the June 22 acceptance by Curry was not time-barred.

Accordingly, *the petition for enforcement is GRANTED.*

*SO ORDERED.*